Case No. 16-2010

## UNITED STATES COURT OF APPEALS
## FOR THE FEDERAL CIRCUIT

### KNOWLES ELECTRONICS, LLC,

*Appellant,*

**v.**

### CIRRUS LOGIC, INC.
### CIRRUS LOGIC INTERNATIONAL (UK) LTD.,

*Appellees.*

Appeal from the United States Patent and Trademark Office, Patent Trial and Appeal Board, in No. 2015-004342.

### APPELLANT KNOWLES ELECTRONICS, LLC'S
### PRINCIPAL BRIEF

Richard L. Rainey
Brian G. Bieluch
Michael S. Sawyer
Cyril Djoukeng
COVINGTON & BURLING LLP
One CityCenter, 850 Tenth St. NW
Washington, DC 20001-4956
Tel: (202) 662-6000

*Attorneys for Appellant Knowles Electronics, LLC*

October 28, 2016

# CERTIFICATE OF INTEREST

Counsel for the Appellant Knowles Electronics LLC certifies the following:

1.    The full name of every party or amicus represented by me is:

Knowles Electronics, LLC

2.    The name of the real party in interest, if the party named in the caption is not the real party in interest, represented by me is:

Knowles Electronics, LLC

3.    All parent corporations and any publicly held companies that own 10 percent or more of the stock of the party or amicus curiae represented by me are:

Knowles Electronics, LLC is a privately held company that is owned, through intermediate entities, by Knowles Corporation, which is a publicly held company traded on the New York Stock Exchange under ticker symbol KN. Franklin Resources, Inc., a publicly held company traded on the New York Stock Exchange under ticker symbol BEN, owns 10% or more of the stock of Knowles Corporation. Janus Capital Management LLC is a privately held company that owns 10% or more of the stock in Knowles Corporation. The 2015 Form 10-K of Janus Capital Group Inc., a publicly held company traded on the New York Stock Exchange under ticker symbol JNS, lists Janus Capital Management LLC as a wholly-owned subsidiary. No other publicly held company owns 10% or more of the stock of Knowles Electronics, LLC or Knowles Corporation.

4.    The names of all law firms and the partners or associates that appeared for the party or amicus now represented by me in the trial court or agency or are expected to appear in this court (and who have not or will not enter an appearance in this case) are:

William Cramer of Conley Rose, PC (formerly of Lathrop & Gage LLP and Dykema Gossett PLLC); Steven McMahon Zeller, Timothy K. Sendek and Jonathan Giroux of Dykema Gossett PLLC.

Date: October 28, 2016

/s/ Brian G. Bieluch
Richard L. Rainey
Brian G. Bieluch
Michael S. Sawyer
Cyril Djoukeng
COVINGTON & BURLING LLP
850 Tenth Street, NW
Washington, DC 20001-4956
(202) 662-6000

*Attorneys for Appellant*

# TABLE OF CONTENTS

**Page**

Statement of Related Cases ................................................................... ix

Jurisdictional Statement .........................................................................1

Statement of Issues ..................................................................................2

Statement of the Case and Relevant Facts ..........................................5

    I.     Technology Background ................................................5

          A.     Electronic Packaging.............................................5

          B.     Assemblies.............................................................10

          C.     Solder Reflow......................................................10

          D.     MEMS Microphones ..........................................11

    II.    U.S. Patent 6,781,231: Microelectromechanical System
          Package With Environmental And Interference Shield .............14

    III.   Halteren Prior Art: Flexible Substrate Transducer
          Assembly ......................................................................16

    IV.   *MEMS Technology Berhad v. International Trade Commission*,
          447 F. App'x 142 (Fed. Cir. 2011)....................................19

    V.    Procedural History ........................................................20

          A.     Requests for *Inter Partes* Reexamination of U.S.
               Patent No. 6,781,231.............................................20

          B.     Knowles's Appeal to the Board. ........................30

          C.     The Board's Decision. ........................................35

          D.     Knowles's Motion to Remand in Light of *Agilent*.............40

Summary of Argument .........................................................................41

Argument ...............................................................................................44

    I.     Standard of Review .......................................................44

    II.    For Claims 1 to 4, the Board's Rejection of the Potentially
          "[M]ost [C]ommonly [A]ccepted" Definition of
          "Package," and Corresponding Invalidity Finding,
          Requires Reversal. ..........................................................45

      A.    The Board Wholly Failed to Apply the Intrinsic and Extrinsic  Evidence, Let Alone *MEMS Technology*. ...........47

      B.    The Board's Having Worked Backward from the Prior Art to Construe "Package" to be an Assembly is Not Substantial Evidence.................................................54

      C.    Alternatively, the Court Should Remand Pursuant to *Power Integrations* for the Board to Address *MEMS Technology*...................................................59

      D.    The Board Ignored Substantial Evidence Establishing That the '231 Patent's "Package" And Halteren's "Assembly" Have Distinct Meanings..............61

  III.  For Claims 23 to 27, the Board's Written Description Analysis Requires Reversal............................................................63

  IV.  The Record Does Not Establish that the Cirrus Entities are Proper Parties, Requiring Vacatur and/or Remand...................75

Conclusion..............................................................................................79

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*AbbVie Deutschland GmbH & Co., KG v. Janssen Biotech, Inc.*,
    759 F.3d 1285 (Fed. Cir. 2014) ........................................................................64

*Agilent Technologies, Inc. v. Waters Technologies Corp.*,
    811 F.3d 1326 (Fed. Cir. 2016) .....................................................40, 76, 77, 78

*Akazawa v. Link New Tech. Int'l, Inc.*,
    520 F.3d 1354 (Fed. Cir. 2008) ........................................................................78

*Ariad Pharm., Inc. v. Eli Lilly & Co.*,
    598 F.3d 1336 (Fed. Cir. 2010) (en banc),................................................*passim*

*Atofina v. Great Lakes Chem. Corp.*,
    441 F.3d 991 (Fed. Cir. 2006) ..........................................................................71

*Bell Commc'ns Research, Inc. v. Vitalink Commc'ns Corp.*,
    55 F.3d 615 (Fed. Cir. 1995) ............................................................................49

*Boston Sci. Corp. v. Johnson & Johnson*,
    647 F.3d 1353 (Fed. Cir. 2011) ........................................................................64

*Bristol-Myers Squibb Co. v. Ben Venue Labs., Inc.*,
    246 F.3d 1368 (Fed. Cir. 2001) ........................................................................71

*Chiron Corp. v. Genentech, Inc.*,
    363 F.3d 1247 (Fed. Cir. 2004) ........................................................................65

*In re Cortright*,
    165 F.3d 1353 (Fed. Cir. 1999) ........................................................................59

*Cuozzo Speed Tech., LLC v. Lee*,
    136 S. Ct. 2131 (2016)......................................................................................44

*In re Gartside*,
    203 F.3d 1305 (Fed. Cir. 2000) ........................................................................78

*In re Gay*,
  309 F.2d 769 (C.C.P.A. 1962) ........................................................65

*In re Howarth*,
  654 F.2d 103 (C.C.P.A. 1981) ........................................................65

*Hybritech Inc. v. Monoclonal Antibodies, Inc.*,
  802 F.2d 1367 (Fed. Cir. 1986) ......................................................64

*Ineos USA LLC v. Berry Plastics Corp.*,
  783 F.3d 865 (Fed. Cir. 2015) ........................................................71

*In re Knowles Electronics, LLC*,
  No. 16-1954 (Fed. Cir.) ................................................................. xii

*Knowles Electronics, LLC v. AAC Technologies Holdings, Inc., et al.*,
  No. 1:06-cv-6213-EEC (N.D. Ill.) .................................................. xii

*LizardTech, Inc. v. Earth Resource Mapping, Inc.*,
  424 F.3d 1336 (Fed. Cir. 2005) ......................................................64

*MEMS Technology Berhad v. International Trade Commission*,
  No. 2010-2018, 447 F. App'x 142 (Fed. Cir. 2011) ...............................*passim*

*Merck & Co. v. U.S. Int'l. Trade Comm'n*,
  774 F.2d 483 (Fed. Cir. 1985) ........................................................78

*Microprocessor Enhancement Corp. v. Texas Instruments*,
  520 F.3d 1367 (Fed. Cir. 2008) ......................................................74

*Microsoft Corp. v. Proxyconn, Inc.*,
  789 F.3d 1292 (Fed. Cir. 2015) ......................................44, 45, 55, 59

*In re Morris*,
  127 F.3d 1048 (Fed. Cir. 1997) ......................................................53

*In re NTP, Inc.*,
  654 F.3d 1279 (Fed. Cir. 2011) ......................................................59

*PPC Broadband, Inc. v. Corning Optical Commc'ns RF, LLC*,
  815 F.3d 747 (Fed. Cir. 2016) ........................................................55

*Power Integrations, Inc. v. Lee*,
   797 F.3d 1318 (Fed. Cir. 2015) ..................................................*passim*

*Pozen Inc. v. Par Pharm., Inc.*,
   696 F.3d 1151 (Fed. Cir. 2012) ........................................................64

*Purdue Pharma L.P. v. Faulding Inc.*,
   230 F.3d 1320 (Fed. Cir. 2000) ..................................................70, 71

*Spectra–Physics, Inc. v. Coherent, Inc.*,
   827 F.2d 1524 (Fed. Cir. 1987) ........................................................65

*Streck, Inc. v. Research & Diagnostic Sys., Inc.*,
   665 F.3d 1269 (Fed. Cir. 2012) ........................................................64

*Symantec Corp. v. Computer Associates Int'l, Inc.*,
   522 F.3d 1279 (Fed. Cir. 2008) ........................................................54

*Trump Plaza Associates v. NLRB*,
   679 F.3d 822 (D.C. Cir. 2012) ..............................................61, 62, 63

*Vederi, LLC v. Google, Inc.*,
   744 F.3d 1376 (Fed. Cir. 2014) ........................................................49

*In re Zurko*,
   258 F.3d 1379 (Fed. Cir. 2001) ........................................................45

**Statutes**

5 U.S.C. § 706 ..................................................................................75

28 U.S.C. § 1295(a)(4)(A) ..................................................................1

35 U.S.C. 112, ¶ 1 ....................................................................28, 31

35 U.S.C. § 141 ......................................................................1, 7, 76

35 U.S.C. § 314(a) ............................................................................26

35 U.S.C. § 315(a)(1) (2010) ........................................................1, 7

35 U.S.C. § 315(b) (2010) ................................................................76

35 U.S.C. § 100(e) .................................................................................76

**Regulations**

37 C.F.R. § 41.8(a) ................................................................................76

**Other Authorities**

Manual of Patent Examining Procedure § 2111 (9th ed. 2015)...............*passim*

# STATEMENT OF RELATED CASES

Pursuant to Federal Circuit Rule 47.5, Appellant Knowles Electronics, LLC states that issues relating to this appeal were previously before this Court in *MEMS Technology Berhad v. International Trade Commission*, No. 2010-2018, 447 F. App'x 142 (Fed. Cir. 2011) (Lourie, Mayer, Gajarsa JJ.), and that an appeal from reexamination proceedings for a patent in a similar subject matter area with the same inventor as here is pending before this Court in *In re Knowles Electronics, LLC*, No. 16-1954 (Fed. Cir.). Knowles further states that, in *Knowles Electronics, LLC v. AAC Technologies Holdings, Inc., et al.*, No. 1:06-cv-6213-EEC (N.D. Ill.), a third party that settled prior litigation is seeking to challenge its royalty obligation based upon reexamination proceedings for U.S. Patent No. 6,781,231 (the "'231 patent"). Knowles has respectfully submitted in those district court proceedings that the reexamination proceedings are irrelevant to the settlement.

# JURISDICTIONAL STATEMENT

In this appeal from a merged *inter partes* reexamination proceeding, the Patent Trial and Appeal Board ("Board") issued its Decision on Appeal on September 9, 2015. Appx1–25. Knowles Electronics, LLC ("Knowles") timely filed a request for rehearing on October 8, 2015. Appx6904–6917. The Board denied that request on April 6, 2016. Appx26–43. Knowles timely filed a Notice of Appeal on May 6, 2016. Appx7009–7011. This Court has jurisdiction under 28 U.S.C. § 1295(a)(4)(A) and 35 U.S.C. §§ 141, 315(a)(1) (2010).

# STATEMENT OF ISSUES

1.    Whether the Board erred in construing the claim term "package" by working backward from a prior art reference disclosing an "assembly," contrary to extensive intrinsic and extrinsic evidence regarding "package," and further erred by declining to substantively address this Court's prior interpretation of "package" in *MEMS Technology*.

2.    Whether the Board erred in concluding that a specification disclosing a microelectronics package with "solder pads" on the bottom for connection to a user's board did not provide written description support for solder pads suitable for "reflow soldering," by declining to consider undisputed evidence showing that a skilled artisan would understand the disclosed "solder pads" to be suitable for the well-known method of "reflow soldering."

3.    Whether the Board erred in permitting Cirrus Logic, Inc. ("Cirrus Inc.") and Cirrus Logic International (UK) Ltd. ("Cirrus UK") to participate in the *inter partes* reexamination, when neither party had filed the reexamination request nor provided evidence that it was a successor-in-interest to an original requestor, and whether these parties may participate in this proceeding.

# PRELIMINARY STATEMENT

In construing the key claim term "package," the Board acknowledges that numerous "technical references cited by [Knowles] may well evidence that skilled artisans *usually, or at least commonly*,"Appx19, would understand "package" to have the definition set forth by Knowles, such that it "might . . . even constitute the *most commonly accepted definition*," Appx22 (emphasis added)—with the definition at issue having been adopted by this Court in *MEMS Technology*.

Nonetheless, the Board declines to adopt this "common[]" definition. Instead, largely skipping the intrinsic evidence, the Board jumps to a large number of submitted extrinsic definitions and picks the two that it perceives as broadest. Regarding this Court's prior decision and analysis in *MEMS Technology*, the Board declines to engage, and instead invokes the broadest reasonable construction standard.

For proposed new claims 23–27, despite the invention disclosing at length a microelectronics *package* with "*solder pads* 31 for *electrical connection to an end user's board*," Appx251 (4:2–4), where the solder pads are on the *bottom* of the inventor's package, *id.*, Figure 3, the Board finds no written

description support for new claims directed toward solder pads "configured" for solder reflow.

Specifically, the Board argues that "the Specification merely sets forth solder pads for connection to a separate printed circuit board without expressly stating that the solder pads are connected." Appx11. Respectfully, there cannot be any reasonable dispute that the inventor's solder pads are suitable for soldering. Additionally, the Board asserts that claiming a "solder pad" configured for standard commercial "solder reflow" in the electronics industry is akin to claiming undisclosed pharmacokinetic features based upon earlier disclosures of related compounds, despite going on to "find that solder reflow is . . . *one* of multiple *specific methods* or species for connecting solder pads to a printed circuit board." Appx14 (emphasis added). The Board's pharmacokinetic analogy is greatly misguided. Applying the correct legal standard, the Board should have recognized that a person of ordinary skill would understand the inventor to have been disclosing a mountable package for attachment to a user's board, through solder pads capable of solder reflow.

In declining to examine the intrinsic evidence, in declining to consider this Court's own analysis of that evidence, in declining to adopt

the "common" definition of the claim term at issue, and in simply picking two extrinsic definitions perceived to be the broadest, the Board abused its discretion and erred. The same is true for the Board's basic errors regarding the inventor's selection of solder pads on the bottom of a microelectronics package designed for mounting to a user's board. This is precisely the type of case where the abuse of discretion and lack of substantial evidence standards are met.

## STATEMENT OF THE CASE AND RELEVANT FACTS

## I.    Technology Background

### A.    Electronic Packaging

The "technology of electronic packaging" is "often understandably described as the technology of electronic interconnections." Appx3442; Appx3435 ("[p]ackaging . . . is the science and art of establishing interconnections and a suitable operating environment for primarily electronic circuits"). By the year 2000 it was "widely accepted that proper electronic packaging fundamentals and practices must be considered in the initial system design phases" because "electronic packaging is often the critical limiting factor in the success of modern electronic systems." Appx3442.

Electronics packaging is a "multidisciplinary" field, "involv[ing] the solution of electrical, mechanical, and thermal problems." Appx3432. Handbooks on packaging therefore describe the field of packaging as "those designs and interconnection technologies necessary to support electrically, thermally, mechanically, and chemically those semiconductor devices with micron dimensions that are often referred to as integrated circuits." Appx3435.

There are several levels of electronics packaging, including integrated circuit packaging, circuit card packaging, and backplane packaging. These levels are illustrated in the below figure of the "electronic packaging hierarchy":



Polycrystalline silicon nuggets

IC chip fabrication

First-level packaging (IC packaging)

Second-level packaging
(package assembly to circuit card)

Third-level packaging
(circuit card assembly to backplane)

**FIGURE 7.1**   Electronic packaging hierarchy.

6

Appx3446. First-level packaging or IC packaging concerns "packaging and interconnecting integrated circuits (ICs)" and is one of "the most critical levels of electronic packaging." Appx3445. As seen in Figure 7.1 above, the IC package "provides mechanical interfacing for . . . electrical interconnection to the next level of packaging." Appx3446–3447. As the "middle link" between the integrated circuit and the system, the IC package "must respond to demands from both ends, that is, wafer fabrication and device trends upstream (circuit level) and circuit board assembly and system performance trends downstream (system level)." Appx3445. That duality "is particularly true in the design, piece part fabrication, and assembly aspects of IC packaging." *Id.*

Another way to describe a first-level or IC package is as a "chip carrier." Appx3461–3462 ("The packaging of a chip or a set of chips in a functional and protective chip carrier is referred to as *first-level packaging*."). An alternate depiction of the packaging hierarchy is also shown below in Figure 1.1:



**Figure 1.1**  Packaging hierarchy of an electronic system.

Appx3460. As seen above, "the individual chip carriers are mounted on a common base, usually a printed wiring board (PWB)," in order to connect the first-level package to the second-level package. Appx3462.

"The external connections of a chip carrier serve to classify the component into one of the two major technological categories: *through hole* components (THC) and *surface mount* components." Appx3462; *see also* Appx3419 ("In general, IC packages can be classified into two categories: 1) through-hole, and 2) surface mount."). Figure 2.23 below illustrates these two types of IC packages:

8



**FIGURE 2.23** Through-hole packages and surface mount packages.

Appx3420. As seen above, "through hole components" contain "leads (external connectors) or pins" that are "inserted through a common mounting surface" in a second-level package, *i.e.*, a printed wiring or circuit board. Appx3462. "For surface mount components, the chip carrier is connected directly to the mounting surface." Appx3462. "The advantage of the surface mount package, as compared to through-hole, is that both sides of the [printed circuit board] can be used, and therefore, higher packing density can be achieved on the board." Appx3419.

9

## B.    Assemblies

In contrast to a "package," an "assembly" is a "microelectronic device *prior to packaging* or encapsulation." Charles A. Harper and Martin B. Miller, *Electronic Packaging, Microelectronics, and Interconnection Dictionary* 10 (hereinafter "Harper Dictionary"), Appx642. Specifically, an "assembly" is a "group of subassemblies and/or [electronic] parts that are put together: the total unit constitutes a major subdivision of the final product," and thus requires a "package" to "provide[] hermetic and environmental protection for, and a particular form factor to, the assembly of electronic components." *Handbook of Flexible Circuits* 234 (Ken Gilleo ed., 1992) (hereinafter, "Gilleo Handbook"), Appx685–686.

## C.    Solder Reflow

The principle method for surface mounting packages to a circuit board is known as solder reflow, in which solder is heated to make connections and then cooled to form joints. *See, e.g.*, Appx671 ("common reflow heating methods" work well for surface mount devices); Appx2835 ("Surface mount assembly [SMA] is done by stencil-printing solder paste to a board, placing the component on the board and then heating the entire assembly, so that the solder melts and forms solder joints."); Appx3425 ("Normally

the SMA soldering process is achieved using a conveyorized reflow

oven . . . .”). Prior art patents teach extensively that reflow soldering is an

“existing manufacturing process,” Appx776, for establishing “[a]n electrical

and mechanical connection” to an external device, Appx767.

During solder reflow, the substrates are “subjected to elevated

temperature used to melt solder” that “often cause the substrates to

expand.” Appx783. It is therefore helpful to “mak[e] the circuit board and

chip carrier of similar materials,” Appx776, with “similar coefficients of

thermal expansion,” Appx1381.

### D.  MEMS Microphones

The second area of technology at issue in this appeal are microphones

made using micro-electro-mechanical systems (MEMS) technology, and the

packaging of such devices. In 2000, “MEMS” was an “emerging

technology,” Appx3543, with the prior decade having “shown significant

promise” for “a variety of applications” and products, such as “pressure

sensors” and “accelerometers.” Appx3538. MEMS technology was facing,

however, a critical roadblock: packaging.

On November 7, 2000, the National Science Foundation (“NSF”)

convened a workshop to address, as one of three critical areas, MEMS

"packaging and reliability." Appx3941. The NSF brought together experts

from industry, academia, and government in the field of "[M]anufacturing

[O]f Micro-ElectroMechanical Systems" (MEMS), Appx3939, who

"identified and discussed" several "challenges" in the field, Appx3941,

Appx3945.

The Final Report concluded that "[p]ackaging (including reliability)

has been and continues to be a major challenge," Appx3941, and noted

that, "[a]t the present time, custom packaging solutions and reliability

qualification processes have been developed for specific products," but

"[s]uch a solution procedure has a potential of stalling the rapid growth of

MEMS applications." Appx3941. As the Final Report put it, "MEMS

packaging" is "a well-known potential 'show stopper.'" Appx3941. These

unique design challenges with MEMS packages arose because the "chip,

package, and environment all must function together and must be

compatible with each other." Appx3531.

Although development work on MEMS microphones first started in

the 1980s and 1990s, MEMS microphones were not successfully

commercialized until 2003, when Knowles released the SiSonic® surface

mount MEMS microphone. Appx3948, Appx3971, Appx3973. At least five

years of MEMS and package development research went into developing
the SiSonic microphone surface mount device (SMD). Appx3948–3949. The
SiSonic SMD replaced more conventional Electret Condenser Microphones
(ECMs), which are temperature sensitive and therefore less stable.
Appx3953–3960, Appx664, Appx1654, Appx4434. By May 2010, Knowles
had "shipped over three billion SiSonic MEMS microphones — a record in
the industry," with most being used in mobile phones. Appx3973.

Knowles has protected its invention through a variety of patents. One
important aspect is the surface mountable package:



Appx3964. After Knowles hurdled the industry-wide "challenge" of
"develop[ing] packaging technologies that meet all the necessary

performance and reliability criteria," Appx3539, it claimed various aspects

of its new design, including aspects of its "package" that led to the patent-

in-suit.

## II.    U.S. Patent 6,781,231: Microelectromechanical System Package With Environmental And Interference Shield

To protect its significant R&D investment, Knowles's lead

package inventor Anthony Minervini sought and obtained, among

other IP, the '231 patent, which discloses and claims a unique

microelectromechanical system package for providing an

environmental and interference shield to a microelectromechanical

system microphone. Appx247–253. Figure 1 shows a cross-sectional

view:



Appx248. This microelectromechanical system package includes the "combination of the substrate 14 and the cover 20," which forms "a housing 22 in which the surface mountable components 12 are located." Appx251 (3:25–27). "The substrate 14 further comprises solder pads 31 for electrical connection to an end user's board," as seen in Figure 3:



**Fig. 3**

Appx249, Appx251 (4:2–4). These solder pads permit the package to "be mounted" on an end user's printed circuit board (PCB) with a smaller footprint than plastic body/lead frame design, where "a gull wing configuration would be used in which the leads widen the overall foot print." Appx251 (3:3–16). The disclosed embodiment also teaches a "better match of thermal coefficients of expansion" by using "FR-4 which is the same material used by end users[']" PCBs. *Id.*

Claim 1 is directed to:

1. A <u>microelectromechanical system package</u> comprising:

a microelectromechanical system microphone; a substrate comprising a surface for supporting the microelectromechanical microphone;

a cover comprising a conductive layer having a center portion bounded by a peripheral edge portion; and

a housing formed by connecting the peripheral edge portion of the cover to the substrate, the center portion of the cover spaced from the surface of the substrate to accommodate the microelectromechanical system microphone, the housing including an acoustic port for allowing an acoustic signal to reach the microelectromechanical system microphone wherein the housing provides protection from an interference signal.

Appx252. All of the remaining claims also recite a "package" for a

"microelectromechanical system." Appx252 (Claims 2–22).

## III.  Halteren Prior Art: Flexible Substrate Transducer Assembly

U.S. Patent No. 6,324,907 ("Halteren") is directed to a flexible

substrate and a transducer "assembly" incorporating the flexible

substrate. The flexible substrate is shown in Figure 4:



## FIG. 4

Appx7301. This flexible substrate is composed of multiple layers of flexible materials like Kapton and glue. Figure 1 of Halteren illustrates the "lower surface of [the] flexible substrate":



## FIG. 1

Appx7297, Appx7305 (7:11–13). Exposed conductors 20 to 23 are "utilized as contact pads that provide required electrical connections between assembly 10 and a piece of electronic equipment (not shown) that holds a connector adapted to contact and fix the position of the exposed parts." Appx7305 (7:28–36).

Although Halteren does not depict how flexible assembly 10 is mechanically connected to another piece of electronic equipment, Halteren does disclose that the other "piece of electronic equipment" is responsible for "holding the assembly." *Id.* at 8:42–45. That other piece of electronic equipment needs to hold the assembly because the "total length of the flexible member 40 is, preferably, within range from 15 to 100mm." *See id.* at 8:19–21.

## IV.   *MEMS Technology Berhad v. International Trade Commission*, 447 F. App'x 142 (Fed. Cir. 2011)

In *MEMS Technology*, Appx2697–2733, this Court previously addressed at length the construction of the term "package" in an appeal from a determination by the International Trade Commission involving the '231 patent and another patent by the same inventor, U.S. Patent No. 7,242,089 (the "'089 patent"). The '089 patent, like the '231 patent, contains apparatus claims that recite a "package" typically in the claim preamble and recite elements of various claimed microphone packages (*e.g.*, housing, substrate, microphone, and acoustic port). Appx2699–2702.

Examining the term "microelectromechanical system package" in certain claims in the '231 patent and addressing extensive intrinsic evidence, the Court concluded that "the *specification describes mounting the MEMS 'packages' of the invention on end-users' printed circuit boards* ('PCBs')." Appx2715–2716 (citing '231 patent, col.3 ll.3–16) (emphasis added). Recognizing that "the *essence of the invention* claimed in the '231 patent is the containment of the components in a 'package,'" Appx2716 (emphasis added, citing '231 patent 1:8–12, 36–41; 3:3–4; 4:40–43; 5:2–5), the Court concluded that the "requirement that the components listed in the claim

19

body *come together to form a mountable package* is thus an 'important

characteristic of the claimed invention,'" *id.* (emphasis added, citation

omitted).

This Court further affirmed the Commission's determination that,

*inter alia*, "a package be capable of *two* levels of electrical connection—one

from the device to the package, and one from the package to an external

circuit or other system." Appx2725–2726 (emphasis added); *see also*

Appx2726 ("[O]ne of ordinary skill in the art would know that a 'package'

is a self-contained unit that has two levels of connection, to the device and

to a circuit (or other system). If there is only one connection level, then

there is no package.") (citations omitted).

## V. Procedural History

### A. Requests for *Inter Partes* Reexamination of U.S. Patent No. 6,781,231.

Between 2009 and 2010, Third-Party Requesters Analog Devices, Inc.

("Analog"), Wolfson PLC ("Wolfson"), and BSE Co., LTD. ("BSE") filed

requests for *inter partes* reexamination that altogether challenged claims 1–

22 of the '231 Patent. Appx197–202, Appx7380–7386, Appx14931–14934,

Appx15087–15088.

The Examiner granted the requests for *inter partes* reexamination, and issued a Non-Final Action affirming claims 5–22 and rejecting claims 1–4 of the '231 patent. Appx362–381, Appx7571–7592. For claims 1–4, the Examiner did not engage in any claim construction of the term "package," nor any other limitation, *see* Appx370–373, Appx7578–7583. The Examiner nonetheless stated that the Halteren assembly shown in Figure 2A below teaches a silicon condenser microphone "package," and that claims 1–4 were anticipated by Halteren. *See* Appx370–373, Appx7578–7583.



FIG. 2A

Knowles responded in several ways. *First*, as to anticipation, Knowles noted that the claims and specification repeatedly describe the invention as a MEMS "package," which "is a term of art to one of ordinary skill." Appx620. Knowles presented substantial evidence of the specialized meaning of the term "package" within the electronics industry, including an industry text that defines "package" as "'an economical and

manufacturable *electromechanical platform* for one or more electronic devices that affords protection, facilitates handling, and *provides the geometric translations and compatible interface required for connection* to the next system level by practical assembly processes.'" Appx620 (quoting Ken Gilleo, *Introduction to Electronic Packaging*, *in* Area Array Packaging Handbook 1.3, 1.3 (Ken Gilleo ed., 2002)) (emphases added), Appx635.

Knowles further noted that Halteren is an "assembly," not a "package." Appx621. Contemporaneous packaging treatises and technical references make clear that an "assembly" and "package" are distinct—an "assembly is merely a group of subassemblies and/or parts that are put together, *and requires a 'package' to provide a particular form factor to an assembly of electronic components*." Appx621 (citing Gilleo Handbook at 234, 253) (emphasis added); *see also id.* (stating that an "assembly" is a "'*microelectronic device prior to packaging* or encapsulation'") (quoting Harper Dictionary); Appx609, Rule 1.132 Declaration of Dr. Kenneth Burton Gilleo ("An 'assembly' is a group of subassemblies and/or parts that are put together; a 'package' is necessary to provide a particular form factor to an assembly of electronic components.").

Instead of a package, Halteren "discloses an alternative to packaging, which surface mounts a device directly to a flexible circuit board." Appx622. Halteren's disclosure "is sometimes referred to as 'chip-on-board' (or 'chip-on-flex') which is recognized as a 'packageless' concept." Appx622 (quoting Gilleo Handbook at 162), Appx653. "'[C]hip-on-flex' [is] a configuration where 'the ***unpackaged*** integrated circuits are attached to a flexible printed circuit.'" *Id.* (quoting *Fundamentals of Microsystems Packaging* 927 (Rao Tummala ed., 2001) (hereinafter "Tummala Fundamentals")). In short, because the '231 patent "claims a 'package,' while [Halteren], at best, merely discloses a flexible circuit assembly," Halteren does not anticipate claims 1–4. Appx622, Appx7968–7972.

*Second*, Knowles added new claims 23–27.[1] Appx612–625 (Analog); Appx7958–7981 (Wolfson). The new claims each recited a "package," like the original claims, Appx614–615, Appx7960–7961, but add an additional limitation directed to solder pads on the "lower surface" of the package substrate, "the lower surface comprising a plurality of solder pads" that are

---

[1] Knowles initially numbered these as claims 22–26, but later renumbered them to claims 23–27, because the patent already included a claim 22.

"capable of electrically connecting"/"configured to electrically connect" "the microelectromechanical system package to the surface of a printed circuit board," Appx7960; *see also* Appx614.

In May 2010, BSE filed its corrected request for reexamination, Appx14931–14956, making arguments similar to Analog and Wolfson. On December 28, 2010, the PTO *sua sponte* issued a "Decision Merging Proceedings." Appx2056–2064, Appx9508–9516, Appx16441–16449.[2]

The Examiner then issued another Non-Final Action that "adopted" analysis from his prior anticipation rejections of claims 1–4 based on Halteren. Appx16423–16424. Once again, the Examiner failed to engage in any claim construction. *See id.* Nor did the Examiner acknowledge, much less dispute, the substantial intrinsic and extrinsic evidence that supported Knowles's construction for "package," establishing a clear distinction between a "package" and an "assembly." Appx619–622. Rather, the Examiner stated, in a conclusory fashion, that Halteren's assembly "teaches a micro-electromechanical system package." Appx16424, Appx16429.

---

[2] For ease of reference, Knowles generally cites herein to the record of one proceeding, given the merger order.

In light of the merger, Knowles filed an "Amendment and Response" with its proposed new claims in the merged proceeding. Appx16451–16452. Knowles further addressed the patentability of the proposed new claims, and in particular the limitations providing for "solder pads" to establish the package's second-level connection to an external device. Specifically, Knowles noted that its new claims further limit Claim 1 by, *inter alia*, "having a plurality of solder pads configured for surface mounting the package." Appx2098–2099.

BSE and Wolfson filed Written Comments in reply, Appx2515–2552 (BSE), Appx2608–2657 (Wolfson), summarily agreeing with the Examiner's rejection of claims 1–4, and declining to respond to Knowles's discussion (Appx619–622) of substantial intrinsic and extrinsic evidence establishing the distinction between a "package" and an "assembly," Appx2520 (BSE), Appx2623 (Wolfson). The requesters also asserted various challenges to new claims 23–27, including anticipation arguments and asserting that they impermissibly enlarge the scope of the patent. Appx2521 (BSE), Appx2633 (Wolfson).

On June 6, 2011, Knowles filed a "Notice of Federal Circuit Decision on Patent In Reexamination," apprising the Examiner that, "[o]n June 3,

2011, in *Mems Technology Berhad v. Int'l Trade Comm.*, Appeal No. 2010-1018, the . . . Federal Circuit upheld the decision of the [ITC] in Investigation No. 337-TA-629, previously identified by the Patent Owner," Appx2693, attaching *MEMS Technology*, Appx2697–2733.

On October 14, 2011, the Examiner maintained his rejections. Appx2751. As to claims 1–4, the Examiner "adopted" without any additional analysis his previous rejections. Appx2758–2761, Appx2766–2768. Further, consistent with his practice of invalidating claims without claim construction, the Examiner rejected claims 23–27 as anticipated by Halteren's assembly based on a finding that Halteren "comprises a lower surface comprising a plurality of solder pads electrically connected to the microphone, wherein the solder pads are capable of electrically connecting the package to the surface of the circuit board." Appx2767–2768. In addition, the Examiner also rejected claims 24–27 "under 35 U.S.C. 314(a) as enlarging the scope of the claims of the patent being examined." Appx2756–2757.

On December 23, 2011, Knowles filed an "Amendment and Response," Appx2799–2819, which further amended claims 23–27, Appx2803, Appx2800–2801. Specifically, Knowles "revised Claims 23 and

24 such that the descriptions of the solder pads on the bottom surface of the substrate make it clear that these solder pads are configured to be used as one of ordinary skill in the art would understand the term 'solder pads'—namely, as the mechanism by which a surface mountable package is electrically connected and mechanically attached to an end user's printed circuit board through the use of a standard surface mounting process," solder reflow. Appx2803.

Regarding the Examiner's rejections of claims 1–4, Knowles again cited substantial intrinsic and extrinsic evidence (Appx2806–2808), establishing that a package "must provide, at least, (a) an enclosure for a device or circuit, (b) protection from mechanical and environmental stress, (c) a first-level connection between the enclosed device/circuit and the package, and (d) a second-level connection between the package and an external printed circuit board." Appx2807. Consistent with this Court's construction in *MEMS Technology* that, "[i]f there is only one connection level, then there is no package," Appx2726, Knowles noted that "this final characteristic [of a package], the second-level interconnect system, . . . is lacking in the assembly disclosed by Halteren." Appx2808. Knowles also noted that, unlike the '231 patent's package, which is designed for

mounting to an external device, Halteren "discloses an assembly that is intended to be plugged into a connector, through the contact pads, on the far end of the assembly." Appx2806.

On September 13, 2013, the Examiner issued a Non-Final Action Closing Prosecution, Appx3735–3876, maintaining without additional analysis his prior rejections, *see, e.g.*, Appx3769. Despite Knowles repeatedly discussing the substantial intrinsic and extrinsic evidence supporting its construction, the Examiner's rejections of certain claims was *identical* to his determinations more than two years earlier. *Compare, e.g.*, Appx2081, *with* Appx3769.

The Examiner also rejected claims 23–27 "under 35 U.S.C. 112, first paragraph, as failing to comply with the written description requirement," Appx3747, stating that claims 23 and 24—and dependent claims 25–27—"require a lower surface of a substrate to include 'a plurality of solder pads,'" which are "'configured to mechanically attach and electrically connect the package to the surface of an external printed circuit board using a solder reflow process," but the "specification fails to disclose a solder reflow process or a description regarding the nature of the solder pads and how they can be mechanically and electrically connected to the

28

next integration level using a solder reflow process," Appx3748. Oddly, however, the Examiner found that "[i]t is inherent that the solder pads of Halteren are suitable for solder reflow because the material disclosed by Halteren (copper, nickel and gold) are suitable for this process," Appx3766, despite Halteren disclosing only *contact* pads.

On October 15, 2013, Knowles filed "Comments to the Action Closing Prosecution," Appx3885–3901, reiterating its prior arguments that Halteren's "assembly" fails to disclose a "package," Appx3889–3890. Knowles also opposed the Examiner's rejections of claims 23–27 for lack of a written description. Knowles noted that "Minervini '231 describes the location and purpose of the solder pads," and "[a] person of ordinary skill in the art would understand that solder reflow was a well-known process for surface mounting a package having pads." Appx3896, Appx3405–3406 (citing extensive extrinsic evidence).

On March 19, 2014, the Examiner issued a Right of Appeal Notice, maintaining his rejections of claims 1–4 and 23–27, and confirming claims 5–22. Appx44–175. The Examiner did not adopt a construction of "package," but instead disagreed with Knowles's construction. Specifically, the Examiner stated that "it would be improper to narrowly read the term

'package' as one that can be connected to a printed circuit board only by through-hole or surface mounting as the second level of connection," while not citing any intrinsic or extrinsic evidence identifying any other means by which a second-level connection is established. Appx163–164. The Examiner did not engage with *MEMS Technology* because, the Examiner reasoned, "Third Party Requesters were not a party to the litigation." Appx165.

With respect to the rejections of claims 23–27 for lack of a written description, the Examiner did not meaningfully respond to Knowles's argument that the specification describes the purpose of the solder pads and that a skilled artisan would, at the time of the invention, have understood that solder reflow was the primary method to create the inventor's connection to an end user's circuit board using solder pads. Appx3405–3406, Appx3896–3897, Appx170.

Knowles timely appealed to the Board. Appx4138–4139.

### B.    Knowles's Appeal to the Board.

On July 1, 2014, Knowles urged reversal. Appx5147–5205. Knowles was explicit that proper construction of the claim term "package" was essential to understanding the inventor's claimed invention.

*First*, Knowles discussed "overwhelming evidence," Appx5158, including the specification, *see id.*, and "several" packaging treatises and technical references, *see* Appx5156, that established the meaning of "package" to "those of ordinary skill in the field of electronics packaging." Appx5155 (quoting Decl. of Dr. Ken Gilleo ¶ 5). Specifically, "an electronics package is a 'housing' whose functions include protecting the electronics (for example, [an] integrated circuit chip or a microelectromechanical device) from mechanical and environmental stress and providing electrical connection" that must have two levels of connection, one to the device inside the package and one to a circuit board (or other device) outside the package. *Id.*

*Second*, Knowles noted that the second-level interconnect between the package and another device, such as a printed circuit board, must include a mounting mechanism. Appx5158–5162. As Knowles explained, every record example of a "package," consistent with the inventor's understanding, fell into one of two categories: through-hole and surface-mount packages. *Id.* (quoting five packaging treatises unanimously agreeing). Moreover, Knowles noted, "none of the experts who submitted declarations on behalf of the third party requesters provided a single data

31

sheet, textbook, patent, journal article, or other piece of substantive evidence to the contrary." Appx5162.

*Third*, Knowles noted that its construction of "package" was supported by the specification of the '231 patent. Appx5158. Knowles explained that the "Minervini '231 package includes a housing that protects the chip within, e.g., C1:L43–54, the top of the package substrate has conductive material for making the first-level electrical connection attaching the devices to the package, e.g., C3:L46–54, and the bottom of the package substrate has solder pads for making the second-level electrical connections attaching the package to an end user's board, C4:L2–4." Appx5158.

*Fourth*, Knowles explained that its construction of package was consistent with this Court's analysis in *MEMS Technology*. Appx5173, Appx6827.

As to anticipation, Knowles noted that Halteren "does not disclose such a package," Appx5167, but instead "discloses only an 'assembly,' and never refers to a 'package,'" Appx5168. "[O]ne of ordinary skill would know" that "an 'assembly' is merely a group of subassemblies and/or parts that are put together, and requires a 'package' to provide a particular

form factor to an assembly of electronic components." Appx5168 (quoting

Gilleo Handbook at 234, 253); Appx5169 (noting that an assembly is a

"'microelectronics device *prior to packaging*'") (quoting Harper Dictionary at

10).

Knowles further noted that Halteren thus "discloses an alternative to

packaging, which surface mounts a device directly to a flexible circuit

board." Appx5169. Halteren's disclosure "is sometimes referred to as 'chip-

on-board' (or 'chip-on-flex') which is recognized as a 'packageless'

concept." Appx5169 (quoting Gilleo Handbook at 162); *see also id.* ("'chip-

on-flex' [is] a configuration where 'the *unpackaged* integrated circuits are

attached to a flexible printed circuit'") (quoting Tummala Fundamentals at

927) (emphasis added), Appx690.

Moreover, and contrary to this Court's construction in *MEMS

Technology* that "[i]f there is only one connection level, then there is no

package," Appx2726 , Knowles noted that Halteren "lacks a package's

second-level connection," because it "is intended to be plugged into a

connector on some other piece of equipment." Appx5169–5170 (citing

Halteren 11:22–28).

As to the Examiner's rejections of claims 23–27 for lack of a written "description regarding the nature of the solder pads and how they can be mechanically and electrically connected to the next integration level using the solder reflow process," Appx5198, Knowles noted that the "specification need not include a detailed explanation for every word of a claim," because "[i]nformation which is well known in the art need not be described in detail in the specification." Appx5199. Claims 23–27 have an adequate written description because the specification "discloses the presence of solder pads 31 on the bottom of the substrate 14," and the "specification describes the purpose of these solder pads: The substrate 14 further comprises solder pads 31 for electrical connection to an end user's board." Appx5199 (quoting C4:L2–4). Furthermore, "[o]ne of ordinary skill in the art would understand that solder reflow was a well-known 'surface mount technology' for surface mounting a package having pads." Appx5200 (discussing technical references).

The Examiner's Answer, Appx6688–6691, incorporated by reference his right of appeal notice. Appx6690.

On August 17, 2015, Knowles filed a notice of supplemental authority regarding this Court's August 12, 2015 decision in *Power Integrations, Inc. v.*

*Lee*, 797 F.3d 1318, 1327 (Fed. Cir. 2015). Appx6794–6796. As Knowles explained, "*Power Integrations* supports Knowles' contention that the Examiner must address <u>and</u> apply *MEMS Technology's* interpretation of the claim term 'package,'" "or at the very least set out sufficiently detailed reasoning to persuasively distinguish these prior judicial holdings," with Knowles requesting "that this matter . . . be remanded for the Examiner to do so." Appx6795.

### C.   The Board's Decision.

On September 9, 2015, the Board issued its Decision and affirmed the Examiner's Halteren anticipation rejections and written description rejections. Appx1–25. The Board rejected, however, the Examiner's determination that claims 24–27 improperly enlarged the scope of the originally filed claims. Appx9.

As to anticipation of claims 1–4, the Board stated that the "technical references cited by Owner may well evidence that skilled artisans *usually, or at least commonly*, understand chip packages to possess second-level connection pins that are soldered by a through-hole or surface mounting process," but that "this extrinsic evidence does not demonstrate that chip packages *necessarily* must possess one of these two types of second-level

connections." Appx19 (emphasis in original). According to the Board, "a package may be connected to an external component such as a wiring board or printed circuit board by any electro-mechanical connection means." Appx22. Contrary to the holding in *MEMS Technology* that, "[i]f there is only one connection level, then there is no package," Appx2726, the Board surmised, at one point, that a package "does not even require . . . second-level connections." Appx21.

The Board summarily discounted *MEMS Technology*, stating that "the Board is to give claims their broadest reasonable interpretation" and "[t]his standard differs from the standard that was followed by" *MEMS Technology*. Appx23. Despite the *Power Integration* directive "to evaluate" a prior judicial claim construction and "determine whether it [i]s consistent with the broadest reasonable construction of the term," 797 F.3d at 1327—notwithstanding that "in reexamination [the Board] applies a *different claim construction standard* than that applied by a district court," *id.* at 1326 (emphasis added)—the Board undertook no such evaluation here, Appx23.

Nor did the Board address, much less dispute, the substantial evidence cited by Knowles establishing that an "assembly"—which is a

36

"'microelectronics device *prior to packaging*'" — is distinct from a "package."

Appx5169 (quoting Harper Dictionary at 10).

The Board then picked what it appears to have perceived as the two broadest definitions of "package" from among a very large group of submitted definitions, Appx20–21, and summarily concluded: "[a]s such, Owner has not established that the Examiner erred finding that Halteren discloses a package, as recited in the claims," Appx22.

As to written description, the Board first argued that "the Specification merely sets forth solder pads for connection to a separate printed circuit board without expressly stating that the solder pads are connected." Appx11. That is, the Board appears to surmise that the inventor's solder pads are not used for soldering the package for connection to a circuit board, and are instead used for some other unstated purpose.

Next, the Board stated that claiming a "solder pad" configured for standard commercial "solder reflow" in the electronics industry is akin to claiming elements of an unknown compound in the pharmaceutical context based upon earlier disclosures of related compounds, despite going on to "find that solder reflow is . . . *one* of multiple *specific methods* or species

for connecting solder pads to a printed circuit board." Appx14 (emphasis added). Rather than examine whether a skilled artisan would have understood the inventor's solder pads on the bottom of his package to have been capable of reflow, the Board oddly focused on whether other connection methods exist. Appx13.

Although the Board cited this Court's seminal *en banc* written description case, *Ariad Pharm., Inc. v. Eli Lilly & Co.*, 598 F.3d 1336 (Fed. Cir. 2010) (en banc), Appx15, the Board appeared to give it short shrift, declining to consider "what would have been *understood objectively* by one of ordinary skill in the art," Appx15, and declining to analyze much of the extrinsic, let alone intrinsic, evidence of record.

Knowles filed a timely request for rehearing, Appx6904–6917, arguing that the Board should grant rehearing for several reasons, including that the Board: (1) ignored "the weight of evidence in interpreting the term 'package' . . . ," Appx6906; (2) improperly disregarded "the "Federal Circuit's [*MEMS Technology*] decision," Appx6911; (3) "overlooked a fundamental difference between Halteren's 'flexible' assembly and the actual 'packages' described in Minervini '231 and the above-cited extrinsic evidence," Appx6911–6912; and (4) as to

38

written description, ignored "[o]bjective evidence indicat[ing] that a person skilled in the art would understand that the disclosed solder pads on the bottom of Minervini's package would be used to surface mount a device through reflow soldering," Appx6914, with the Board misapplying genus-species case law, Appx6915.

The Board denied rehearing. Appx26–43. In response to Knowles noting that detailed evidence requires Knowles's construction of "package," the Board continued to decline to engage with the vast weight of evidence. Instead, the Board stated that "the dispositive issue is whether the record contains sufficient evidence to conclude that the broadest reasonable interpretation of 'package' must be limited to the narrow definition preferred by Owner." Appx34. Regarding Knowles's having noted that "the record is devoid of a *single corroborated example* of the term 'package' being used to describe a technology with any electro-mechanical connection means other than surface mounting or by through-hole mounting," Appx6910 (emphasis added), the Board speculated nonetheless that there could be other, unidentified examples of "packages." The Board continued not to engage with *MEMS Technology*, and instead invoked the "broadest-reasonable interpretation standard." Appx35.

As to written description, the Board turned to obviousness language, stating that "evidence of what one skilled in the art would have understood to be obvious in light of a disclosure" is not relevant to the "requirement that a claim possess adequate written description." Appx39. The Board also reiterated its "genus-species rubric" argument. Appx41.

On May 6, 2016, Knowles timely appealed to this Court.

On May 10, 2016, Analog filed a notice of non-participation. *See* Dkt. No. 3. After BSE did not enter an appearance, the Clerk revised the caption to remove BSE. *See* Dkt. No. 18. Cirrus Inc. and Cirrus UK are the two remaining appellees.

### D.   Knowles's Motion to Remand in Light of *Agilent*

In this Court, Knowles filed a motion to remand "in light of this Court's recent decision in *Agilent Technologies, Inc. v. Waters Technologies Corp.*, 811 F.3d 1326 (Fed. Cir. 2016), for the PTO to enter findings" as to whether Cirrus Inc. and Cirrus UK constitute the third-party requester in this matter. Knowles's Mot. for Remand at 1 (Dkt. No. 23). That motion noted that the record is devoid of any evidence that Cirrus Inc. and Cirrus UK, who are named in the caption of this matter as "Appellees," are the successor-in-interest or constitute the third-party requester, Wolfson PLC,

which filed the underlying reexamination request. *Id.* at 2, 4–17. Knowles further argued that Cirrus cannot submit such evidence for the first time on appeal. *Id.* at 17–20. Cirrus opposed, submitting 242 pages of extra-record papers in support of its claim that one Cirrus entity is, in effect, the same entity as the requester. Dkt. No. 29. In reply, Knowles noted that Cirrus had conclusively established that Cirrus Inc. should not have been allowed to participate. Knowles further noted that it is improper to consider any of Cirrus's extra-record evidence, which, *inter alia*, addressed a question of foreign law that could only be addressed on remand. Dkt. No. 32. On September 28, the Court issued an order denying Knowles's motion, holding, *inter alia*, that "[t]o the extent that Knowles wishes to challenge the Board's decision to name the Cirrus entities as third party requesters, Knowles may raise its arguments in its opening brief." Dkt. No. 33.

## SUMMARY OF ARGUMENT

Regarding original claims 1–4, the Board's improper construction of "package" requires vacatur and reversal. *First*, the Board wholly failed to analyze the intrinsic evidence nor credit substantial extrinsic evidence in support of Knowles's construction, let alone substantively engage with *MEMS Technology*'s analysis regarding the same claim term and patent. The

41

Board legally erred in concluding that it was "immaterial" that Knowles's construction may "constitute *the most commonly accepted* definition," Appx22 (emphasis added), contrary to the requirement that "the meaning given to a claim term must be consistent with the *ordinary and customary meaning* of the term (unless the term has been given a special definition in the specification), and must be consistent with the use of the claim term in the *specification* and *drawings*." Manual of Patent Examining Procedure § 2111 (9th ed. 2015) ("MPEP") (emphasis added).

*Second*, where the Board concluded that the numerous "technical references" cited by Knowles may evidence the "common[]" understanding of "package," Appx19, set forth by Knowles, the Board erred in nonetheless picking two definitions of "package" based upon the its perception that these two definitions were the very broadest of the submissions.

*Third*, in *Power Integrations, Inc. v. Lee*, this Court made explicit that, in certain circumstances, the Board has an "obligation" to evaluate a previous judicial interpretation of disputed claims "and to determine whether it [is] consistent with the broadest reasonable construction of the term." 797 F.3d at 1327. That circumstance is present here. The Board should substantively

engage with the analysis in *MEMS Technology* and explain why it counsels in favor of the Board's present approach or adoption of Knowles's construction. For all of these reasons and as set forth below, the Board's invalidity findings must be set aside.

Regarding new claims 23–27, the Board's written description finding is erroneous and requires vacatur and reversal. The new claims are directed to "***solder pads*** . . . ***configured to*** mechanically attach and electrically connect the package to a surface of an external printed circuit board using a ***solder reflow*** process." While the Board argues that "the Specification merely sets forth solder pads for connection to a separate printed circuit board" without expressly stating how the solder pads are connected, Appx11, a skilled artisan reading this disclosure in the context of this invention would understand that the inventor's solder pads are configured for soldering via the well-known technique of solder reflow.

Separately, as Knowles has previously argued, the record does not establish Cirrus's right to participate in these proceedings.

# ARGUMENT

## I.    Standard of Review

"As a general matter," this Court "review[s] the Board's conclusions

of law *de novo* and its findings of fact for substantial evidence." *Microsoft*

*Corp. v. Proxyconn, Inc.*, 789 F.3d 1292, 1297 (Fed. Cir. 2015). In construing

claims, the Board applies the "broadest reasonable construction." *Cuozzo*

*Speed Tech., LLC v. Lee*, 136 S. Ct. 2131, 2133 (2016).

"The broadest reasonable interpretation does not mean the broadest

possible interpretation." MPEP § 2111. "Rather, the meaning given to a

claim term must be consistent with the *ordinary and customary meaning* of

the term (unless the term has been given a special definition in the

specification), and must be consistent with the use of the claim term in the

*specification* and *drawings*." *Id.* (emphasis added). "Further, the broadest

reasonable interpretation of the claims must be consistent with the

interpretation that those skilled in the art would reach." *Id.* "Thus the focus

of the inquiry regarding the meaning of a claim should be what would be

reasonable from the perspective of one of ordinary skill in the art." *Id.*

This Court reviews "the Board's ultimate claim constructions *de novo*

and its underlying factual determinations involving extrinsic evidence for

substantial evidence." *Proxyconn, Inc.*, 789 F.3d at 1297. If "the intrinsic record fully determines the proper construction," the Court "review[s] the Board's claim constructions *de novo*" and "need not consider" extrinsic evidence. *Id.* "Substantial evidence is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *In re Zurko*, 258 F.3d 1379, 1384 (Fed. Cir. 2001) (citation omitted).

Whether a patent complies with the written description requirement is a "question of fact" that is reviewed "for substantial evidence." *Ariad*, 598 F.3d at 1351, 1355 (quotation marks omitted).

## II. For Claims 1 to 4, the Board's Rejection of the Potentially "[M]ost [C]ommonly [A]ccepted" Definition of "Package," and Corresponding Invalidity Finding, Requires Reversal.

Regarding challenged claims 1–4, the Board fundamentally erred in concluding that the inventor's microelectronics "package" need not have a second-level connection and need not be mountable. There is overwhelming evidence that it must. *See* Appx5154–5162.

The Board starts its claim construction analysis by looking to Halteren, Appx16, and seeking to construe the "flexible substrate transducer assembly" of Halteren as the inventor's package, *id*. This results in the Board's fundamentally erroneous conclusion that a microelectronics

package "need not even necessarily include any second-level connection at all," Appx21; *but see* Appx22 n.7 (suggesting the Board did not resolve this issue), and need not be mounted, but perhaps might be "connected to an external component . . . by any electro-mechanical connection means," Appx22, while leaving such means undefined.

The Board's fundamental error can perhaps best be seen in its statement that it is "immaterial" whether Knowles's construction is "a *commonly* accepted definition, or even constitute[s] *the most* commonly accepted definition," Appx22 (emphasis added), with the Board going so far as to state that the "technical references" cited by Knowles "evidence that skilled artisans *usually*" or "*at least commonly*" understand "chip packages to possess second-level connection pins that are soldered by a through-hole or surface mounting process," Appx19—the very construction Knowles advanced. Under the broadest reasonable interpretation standard, the Board's interpretation was required to "be consistent with th[is] *ordinary and customary meaning* of the term." MPEP § 2111.

The Board's error is exacerbated by its failure to engage with *MEMS Technology*, which notes, precisely as Knowles has noted, that the term

"package" reflects "the essence of the invention claimed in the '231 patent,"

Appx2716—"the containment of the components in a 'package,'" *id.*, and

"[t]he requirement that the components listed in the claim body *come*

*together to form a mountable package*," *id.* The Board's construction was

fundamentally not "consistent with the use of the claim term in the

*specification* and *drawings*." MPEP § 2111.

At base, the Board abused its discretion when it ignored the ordinary

and common meaning of the term "package" to a person of ordinary skill

in the art, ignored substantial intrinsic evidence, ignored five packaging

treatises contrary to its construction, and improperly started with the prior

art in attempting to construe a prior art "assembly" to be a mountable

microelectronics package. The Board's construction must be reversed.

### A.   The Board Wholly Failed to Apply the Intrinsic and Extrinsic Evidence, Let Alone *MEMS Technology*.

The intrinsic and extrinsic evidence, including this Court's analysis

and construction in *MEMS Technology*, confirms Knowles's construction

that the inventor's "package" requires a second-level connection with a

mounting mechanism.

*First*, the Board wholly failed to engage with the specification, failing to construe the claim term "consistent with the use of the claim term in the specification and drawings," and "with the interpretation that those skilled in the art would reach." MPEP § 2111. The specification of the '231 patent, which this Court discussed at length in *MEMS Technology*, *see* Appx2700–2702, Appx2715–2716, Appx2725–2729, makes explicit that the inventor was creating a "package" for the purpose of mounting to form a second-level connection. *See, e.g.*, Appx251 (3:3–8) ("The present invention is directed to microelectromechanical system (MEMS) packages. The embodiment disclosed herein would have a better match of thermal coefficients of expansion with the end user's PCB since this part would typically be *mounted* of FR-4 which is the same material used by end users.") (emphasis added); Appx251 (4:3–4) ("The substrate 14 further comprises solder pads 31 for electrical connection to an end user's board.").

When the inventor discusses creating a "package" with "solder pads" that will allow his invention to be soldered to a user's FR-4 board, it is explicit to a skilled artisan that the inventor is seeking to develop a microelectronics package to house a component being attached to a board. The Board must consider the field of art in which the inventor is working

and what the inventor means, based upon the intrinsic and extrinsic evidence. The inventor is not referencing a package for cereal, nor for shipping, nor an unpacked "assembly" of parts connected to a flexible substrate to be wound through a hearing aid, as in Halteren. Rather, "package" is referencing "the essence of the invention claimed in the '231 patent," Appx22566—"the requirement that the components listed in the claim body *come together to form a mountable package*," *id.* "[O]ne of ordinary skill in the art would know that a 'package' is a self-contained unit that has two levels of connection, to the device and to a circuit (or other system). If there is only one connection level, then there is no package." Appx22576 (citations omitted).

The Board's analysis of "package" *never once* addressed the specification or claim language. *See* Appx16–23. This failure, standing alone, is clear error. *See, e.g., Bell Commc'ns Research, Inc. v. Vitalink Commc'ns Corp.*, 55 F.3d 615, 621 (Fed. Cir. 1995) ("[I]t is legal error to construe a claim by considering it in isolation. A claim must be read in view of the specification of which it is a part."); *see also Vederi, LLC v. Google, Inc.*, 744 F.3d 1376, 1382 (Fed. Cir. 2014) (similar).

*Second*, the extrinsic evidence, fairly reviewed and understood, confirms Knowles's construction. Specifically, the submitted packaging treatises consistently show that skilled artisans at the time of the invention recognized two categories of mounting types for microelectronics packages to form second-level connections, through-hole and surface mount, from the broader universe of packages:

- "IC packages come in a variety of . . . *mounting* types that are grouped into families *defined by the method of mounting* to *level 2* [*through-hole* (TH) or *surface-mount* (SM)] . . . ." *Electronic Packaging and Interconnection Handbook*, 7.3 (Charles A. Harper ed., 2000) (emphasis added, brackets in original), Appx3447, Appx5159.

- "In general, IC packages can be classified into two categories: 1) *through-hole*, and 2) *surface mount.* These two categories refer to the methodology used in assembling the packages *to the printed wiring board* (PWB). If the packages have pins that can be inserted into holes in the PWB, they are called through-hole packages. If the packages are not inserted into the PWB, but are mounted on the surface of the PWB, they are called

surface mount packages." Tummala Fundamentals at 67

(emphasis added), Appx5159, Appx2833.

- "There are *two basic types of connections* between *the first-
  and second-level packages*: those with pins, requiring plated-
  *through-hole* (PTH), and others with pins or pads meant for
  *surface mounting* the device (SMD) by the use of Surface
  Mounting Technology (SMT). *All the available packages are
  classified . . . into one of these categories*." *Microelectronics
  Packaging Handbook* 42 (Rao Tummala *et al.*, eds., 1989)
  (emphasis added) (hereinafter "Tummala Handbook"),
  Appx5159, Appx2847.

- "The external connections of a chip carrier serve to classify the
  component into *one of the two major technological categories*:
  *through hole* components (THC) and *surface mount*
  components. For through hole components, the leads (external
  connectors) or pins are inserted through a common mounting
  surface. For surface mount components, the chip carrier is
  connected directly to the mounting surface." *Handbook of*

*Electronic Package Design* (Michael Pecht, ed., 1991) (emphasis added), Appx5159, Appx2842.

- The "Printed circuit board (PBC) or next level interconnect approach" list two alternatives: "***Through-hole*** – Pins" and "***Surface mount*** – leads, pads, pins." *Semiconductor Packaging* (Robert J. Hannemann *et al.,* eds., 1994) (emphasis added), Appx5160, Appx3480.

The Board responds by acknowledging that the "technical references" cited by Knowles "may well evidence that skilled artisans *usually*" or "*at least commonly*" understand "chip packages to possess second-level connection pins that are soldered by a through-hole or surface mounting process," Appx19 (emphasis in original)—the very construction Knowles advanced. The Board then concludes, however, that it is "it is immaterial whether the narrow interpretation of 'package' urged by the Owner might constitute a *commonly accepted definition*, or even constitute the *most commonly accepted definition*." Appx22 (emphasis added).

Respectfully, this conclusion fundamentally misapplies the broadest *reasonable* construction standard. In determining what constitutes the broadest "reasonable" construction, the Board must construe claims based

on "their *ordinary usage* as they would be understood by one of ordinary skill in the art," *In re Morris*, 127 F.3d 1048, 1054 (Fed. Cir. 1997) (emphasis added); *see* MPEP § 2111. Setting aside the Board's failure to address intrinsic evidence, when the Board concluded that extensive extrinsic evidence establishes "that skilled artisans *usually*" or "*at least commonly*" would understand the inventor to be referencing the understanding of a microelectronics package put forth by Knowles, that is, in fact, the broadest *reasonable* construction. In declining to adopt what "might . . . even constitute the *most commonly accepted definition*," Appx22, the Board fundamentally erred.

*Finally*, *MEMS Technology* confirms that it was arbitrary and capricious to depart from the "common" understanding of a microelectronics "package." The Board should have read *MEMS Technology* and concluded that a "package" requires a "self-contained unit that has two levels of connection, to the device and to a circuit (or other system)," Appx2726 (citations omitted), and that this unit must be "mountable," Appx2716. The Board leaves *MEMS Technology* wholly unaddressed, save for a statement that the decision was decided under a litigation claim construction standard. Appx23. Particularly where the Board has failed to

53

address any intrinsic evidence, and where this Court has extensively discussed such evidence, the Board must provide reasoned, on-the-merits analysis for departing from *MEMS Technology*. Absent such analysis, accepting the Board's new approach would "vitiate the meaning that [the Court] previously gave to the term ['package'] in" *MEMS Technology*. *Symantec Corp. v. Computer Associates Int'l, Inc.*, 522 F.3d 1279, 1289 (Fed. Cir. 2008).

### B.    The Board's Having Worked Backward from the Prior Art to Construe "Package" to be an Assembly is Not Substantial Evidence.

The Board hypothesizes that two extrinsic definitions, selected by the Board from ten submitted definitions, Appx5155–5156, counsel a construction contrary to Knowles's construction. They do not. Specifically the Board argues that two extrinsic sources suggest that microelectronics packages do not "*necessarily* . . . possess one of these two types of second-level connections, Appx19 (emphasis in original), and, at least in passing, suggests that a microelectronics package is not, in fact, a device that "necessarily include[s] any second-level connection at all." Appx21. This speculation is fundamentally flawed.

At the outset, the Board has improperly skipped over the intrinsic evidence and various other definitions establishing the common meaning of the term, in favor of picking what the Board appears to perceive as the very broadest extrinsic definitions. As set forth in MPEP § 2111, however, "[t]he broadest reasonable interpretation does not mean the broadest possible interpretation." *Id.* Accordingly, this Court recently reminded the Board that it is error to, as here, "arrive[] at its construction by referencing the dictionaries cited by the parties and simply selecting the broadest definition therein." *PPC Broadband, Inc. v. Corning Optical Commc'ns RF, LLC*, 815 F.3d 747, 752 (Fed. Cir. 2016); *see also Microsoft Corp. v. Proxyconn, Inc.*, 789 F.3d 1292, 1298 (Fed. Cir. 2015) (similar).

That improper approach from *PPC Broadband* has been repeated here, with the Board simply picking definitions from the Harper Dictionary and JEDEC Standard No. JESD99A. Specifically, *first*, the Board picks JEDEC Standard No. JESD99A from February 2000. The Board states that this particular "JDEC [sic] standard includes the following entry: 'package (of a semiconductor device): An enclosure for one or more semiconductor chips (dice), film elements, or other components, that allows electrical connection and provides mechanical and environmental protection.'" Appx20. *Second*,

the Board looks to the Harper Dictionary, which states: "Package (1) An enclosure for electronic components and hybrid circuits consisting of a header, a lid, and hermetically sealed feedthrough terminal leads. Packages are made of metal, ceramic, and plastic. (2) An enclosure or housing used to contain any level of electronic system or subsystem." Appx21 (quoting Harper Dictionary).

Even if it were permissible to skip the intrinsic record and the substantial extrinsic evidence to the contrary, it would still be erroneous on this record to adopt these two extrinsic sources. The Board has not explained why JEDEC Standard No. JESD99A (Feb. 2000) definitively resolves what this inventor meant in claiming his "package." Indeed, the Board even claimed that, under the JEDEC definition, "the term 'package' would include chip assemblies that do not possess any second-level electrical connection," Appx21, thereby directly contradicting (a) the disclosure of the '231 patent which teaches, consistent with other extrinsic evidence, that a package provides "electrical connection to an end user's board," Appx251 (4:3–4), and (b) this Court's decision that a package requires "*two* levels of electrical connection—one from the device to the package, and one from the package to an external circuit or other system."

56

Appx2725–2726 (emphasis added). However, because the JEDEC definition does not specifically recite this aspect of electrical connection, the Board erroneously assumes it must not exist, despite the tremendous evidence to the contrary.

Indeed, the Board's understanding of the JEDEC definition is so remarkably broad that it would encompass a sturdy cardboard box. After all, if no electrical connection outside the package is necessary, a cardboard box would meet the remaining elements of the definition, the Board might argue: it is an enclosure that allows electrical connection (of components within the box) and provides mechanical and environmental protection. But no skilled artisan would consider a cardboard box to be the type of "package" referenced by the inventor.

As to the Harper Dictionary, the Board inexplicably looked to the definition of "package" from that source, while wholly failing to consider that source's definition of "assembly" as a "microelectronics device *prior to packaging*." Appx642 (emphasis added). As explained below, Halteren discloses only an assembly and never uses the term "package." The Board's reliance on one definition from the Harper Dictionary, without ever

57

considering the countervailing definition from the same dictionary that Knowles presented, Appx5169, is the very definition of arbitrary.

In sum, the Board's approach to definitions improperly assumes that a definition in a vacuum can be dispositive, leading to absurd results. For example, one dictionary defines a "car" as "a road vehicle, typically with four wheels, powered by an internal-combustion engine and able to carry a small number of people." Oxford Dictionary of English 260 (Angus Stevenson ed., 3d ed. 2010). But the Board's framework here would justify using that definition to say that motorcycles are "cars." The number of wheels "typically" associated with a car can be ignored because the definition does not state that a car *necessarily* must possess" four wheels. *See* Appx18–19 (discounting "general," "basic," and "major" requirements of a package). Thus, because motorcycles can carry two people (a driver and a passenger riding pillion), under the Board's approach, motorcycles would be considered "cars." Such an absurd result can be avoided by considering more than a single definition pared down to arbitrarily selected "necessary" portions.

Fundamentally, in seeking to begin and end its claim construction analysis by selecting the perceived broadest definitions of "package," the

Board has failed to address the intrinsic and extrinsic evidence describing the inventor's "mountable package." *See* Appx22656–22567, Appx22575–22579. Neither of the two extrinsic definitions selected by the Board constitute "substantial evidence" warranting departure from the overwhelming record evidence of the "common[]" understanding of "package." *See Proxyconn*, 789 F.3d at 1297. The Board's construction "cannot be divorced from the specification and the record evidence," *In re NTP, Inc.*, 654 F.3d 1279, 1288 (Fed. Cir. 2011), and "must be consistent with the one that those skilled in the art would reach," *In re Cortright*, 165 F.3d 1353, 1358 (Fed. Cir. 1999). The Board's construction should be reversed.

### C. Alternatively, the Court Should Remand Pursuant to *Power Integrations* for the Board to Address *MEMS Technology*

In *Power Integrations, Inc. v. Lee*, this Court made explicit that, in certain circumstances, the Board has an "obligation" to evaluate a previous judicial interpretation of disputed claims "and to determine whether it [is] consistent with the broadest reasonable construction of the term." 797 F.3d at 1327. Those "circumstances" giving rise to the Board's obligation are present when a party's "argument to the board about the proper

interpretation of" disputed claims are "tied" to a previous judicial interpretation of those claims. *Id.* This is precisely such a case.

As in *Power Integrations*, Knowles's construction of the term "package" below "was expressly tied" to a judicial claim construction. Knowles repeatedly invoked *MEMS Technology*, in noting that the term "package" requires a second-level connection with a mounting mechanism. Appx5173, Appx6827, Appx6910. After *Power Integrations* issued, Knowles filed a notice of supplemental authority, urging the Board to apply *MEMS Technology*, as directed by *Power Integrations*. Appx6795–6796.

Despite Knowles's repeated requests that the Board adopt the definition of "package" in *MEMS Technology* and consider and address the Court's analysis and definition of "package," the Board refused to evaluate that construction, offering only that "in reexamination proceedings, the Board is to give claims their broadest reasonable interpretation." Appx23. But that is true in every reexamination where a prior judicial construction is at issue. Furthermore, *Power Integrations* already rejected this argument, in instructing that the prior judicial construction must be evaluated even though "in reexamination [the Board] applies a different claim construction standard than that applied by a district court." 797 F.3d at 1326 (emphasis

added). Nor does the Board's perfunctory discussion of *MEMS Technology*
on rehearing cure the problem, as the Board simply invoked the broadest-
reasonable-interpretation standard again. Appx35.

A great deal of both private and public resources were utilized in
leading to this Court's *MEMS Technology* decision. The Board should be
directed to explain why the analysis in *MEMS Technology* would or would
not change its decision. *See, e.g.*, *Trump Plaza Associates v. NLRB*, 679 F.3d
822, 831 (D.C. Cir. 2012) (vacating and remanding because the "Board has
given no 'reasoned explanation' for its departure from this precedent").

### D.    The Board Ignored Substantial Evidence Establishing That the '231 Patent's "Package" And Halteren's "Assembly" Have Distinct Meanings.

All of the foregoing grounds warrant remanding. But in any event,
the Halteren assembly does not disclose a package. Halteren lacks any
mounting mechanism or mechanical second-level connection. As Knowles
repeatedly explained, Halteren's assembly "is intended to be plugged into
a connector on some other piece of equipment." Appx5170. The assembly
discloses "exposed parts" that are "utilized as ***contact pads*** that provided
required electrical connections between the assembly 10 and a piece of
electronic equipment (not shown) that holds a ***connector adapted to***

***contact*** and fix the position of the exposed parts." Appx5170 (quoting

Halteren 11:22–28).

Furthermore, substantial evidence in the record establishes that a

"package" and an "assembly" are distinct. As Knowles repeatedly

emphasized, "one of ordinary skill would know" that "an 'assembly' is

merely a group of subassemblies and/or parts that are put together, and

requires a 'package' to provide a particular form factor to an assembly of

electronic components." Appx5168 (quoting Gilleo Handbook at 234, 253);

Appx5169 (noting that an assembly is a "'microelectronics device *prior to*

*packaging*'") (quoting Harper Dictionary at 10).

Halteren thus "discloses an alternative to packaging, which surface

mounts a device directly to a flexible circuit board." Appx5169. Halteren's

disclosure, Knowles explained, "is sometimes referred to as 'chip-on-board'

(or 'chip-on-flex') which is recognized as a 'packageless' concept."

Appx5169 (quoting Gilleo Handbook at 162); *see also id.* (stating that a

"'chip-on-flex' [is] a configuration where "the *unpackaged* integrated circuits

are attached to a flexible printed circuit") (emphasis added) (quoting

Tummala Fundamentals at 927). Neither the Board nor the Examiner ever

dispute or even acknowledge this substantial evidence distinguishing a "package" from an "assembly."

Moreover, under the proper construction of "package" as requiring a mountable second-level connection, the Halteren "assembly" fails to disclose a "package"; it has no second-level connection for electrical and mechanical connection, as it instead uses exposed conductors as "contact pads that provide required electrical connections" to "a connector," Appx7305 (7:28–36), and is not mountable, as it uses another "piece of electronic equipment" for "holding the assembly," *id.* (8:42–45). Accordingly, the Board's anticipation finding should be reversed.

## III.  For Claims 23 to 27, the Board's Written Description Analysis Requires Reversal.

The Board rejected claims 23–27 because it found the claim limitation—"wherein the *solder pads* are *configured to* mechanically attach and electrically connect the package to a surface of an external printed circuit board using a *solder reflow* process"—failed to meet the written description requirement. Appx11 (emphasis added).

A written description is sufficient if "the disclosure of the application relied upon reasonably conveys *to those skilled in the art* that the inventor

had possession of the claimed subject matter as of the filing date." *Ariad*

*Pharm.*, 598 F.3d at 1351 (emphasis added). While "possession is shown by

disclosure in the patent," *AbbVie Deutschland GmbH & Co., KG v. Janssen*

*Biotech, Inc.*, 759 F.3d 1285, 1299 (Fed. Cir. 2014), "a patentee can rely on

information that is 'well-known in the art' to satisfy written description,"

*Streck, Inc. v. Research & Diagnostic Sys., Inc.*, 665 F.3d 1269, 1285 (Fed. Cir.

2012) (quoting *Boston Sci. Corp. v. Johnson & Johnson*, 647 F.3d 1353, 1366

(Fed. Cir. 2011)), because the specification is intended to "describe[] the

invention in such a way that it is understandable to a person of ordinary

skill in the art," *Pozen Inc. v. Par Pharm., Inc.*, 696 F.3d 1151, 1167 (Fed. Cir.

2012).

The "'specification is written for a person of skill in the art [that]

comes to the patent with knowledge of what has come before" and "it is

[thus] unnecessary to spell out every detail.'" *Pozen*, 696 F.3d at 1167

(quoting *LizardTech, Inc. v. Earth Resource Mapping, Inc.*, 424 F.3d 1336, 1345

(Fed. Cir. 2005)). And this Court has admonished patentees against

including well-known information in the patent. *See, e.g.*, *Streck*, 665 F.3d at

1288 ("'[A] patent need not teach, and preferably omits, what is well

known in the art.'") (quoting *Hybritech Inc. v. Monoclonal Antibodies, Inc.*,

802 F.2d 1367, 1384 (Fed. Cir. 1986); *Chiron Corp. v. Genentech, Inc.*, 363 F.3d 1247, 1254 (Fed. Cir. 2004) (similar); *Spectra–Physics, Inc. v. Coherent, Inc.*, 827 F.2d 1524, 1534 (Fed. Cir. 1987) (similar); *In re Howarth*, 654 F.2d 103, 105 (C.C.P.A. 1981) (similar); *In re Gay*, 309 F.2d 769, 774 (C.C.P.A. 1962) (similar). The Board's written description analysis is erroneous and not supported by substantial evidence for three reasons.

*First*, the Board fundamentally erred in predicating its analysis upon the notion that its task was **_not_** to address "what would have been *understood objectively* by one of ordinary skill in the art." Appx15 (emphasis added). The Board cites this Court's seminal written description case law in *Ariad* and recites that the "the Specification must provide some guides or 'blaze marks' that disclose the claimed invention 'specifically, as something appellants actually invented.'"Appx15 (quoting *Ariad*, 598 F.3d at 1348). Fundamentally, however, the Board does not heed *Ariad*'s teaching that the relevant question is what "the disclosure of the application relied upon *reasonably conveys* to those *skilled in the art." Ariad Pharm.*, 598 F.3d at 1351 (emphasis added). The "state of the art at the time of filing," and such "prior art knowledge," left almost wholly unaddressed by the Board, are necessary in evaluating written description. *Ariad*, 598 F.3d at 1358.

65

Here, the state of the art makes explicit that the Board missed the unremarkable proposition that the solder pads on the bottom of the inventor's microelectronics package were intended to be capable of reflow attachment to a user's board.  Numerous packaging treatises submitted during reexamination describe that microelectronics packages with "***pads*** [are] meant for ***surface mounting*** the device (SMD) by the use of Surface Mounting Technology (SMT)." Tummala Handbook at 42 (emphasis added), Appx5159, Appx5200; *see also supra* at 50–52 (showing that pads are for surface mounting). And numerous treatises submitted by Knowles likewise establish that solder reflow is the principle method of interconnecting surface mount devices. *See* Appx671 (Gilleo Handbook at 184 ) ("The *common reflow heating methods*, such as IR, vapor phase, and hot bar work well for [surface mount] connectors."); *see also supra* at 10–11. It was well known, for example, that "solder balls on the underside of the package" are used "to *mount* and *reflow* to a printed circuit motherboard." Robert C. Marrs, *Plastic Ball Grid Array Packaging Technology*, *in* Ball Grid Array Technology (John H. Lau ed., 1995), Appx1345–1346 (emphasis added).

Numerous prior art references show this common mass-manufacturing procedure for soldering to a board. As explained in U.S. Patent No. 4,700,276, "[a]n *electrical and mechanical connection* is then made by *soldering* the chip carrier to this generally larger board *by reflow soldering*." Appx767 (emphasis added); *see also* Appx776 (U.S. Patent No. 6,472,611). U.S. Patent No. 5,740,954 (the "'954 patent"), for example, describes a skilled artisan's understanding that solder reflow is used to mount a component where the component has an array of *solder pads* on its surface. Appx2803. As the '954 patent explains, when there is an "array of solder connections on a surface of [a] component," the surface of the component "is positioned to confront an identical grid array of circuit pads on a circuit board, and the solder beads, balls or columns are heated to reflow to attach or detach the component from the circuit board." '954 patent, 1:57 to 2:1. Surface mounted components "require simultaneous reflow of all solder connections to the circuit board," making a "uniform heating" important "to uniformly melt all of the solder balls or columns." *Id.* at 2:2–9. Thus, the electronics industry uses reflow ovens to solder reflow to circuit boards in an automated fashion, such as the Air-Vac DRS22 prior art system. *Id.* at 2:10–13. By declining to consider "what

would have been *understood objectively* by one of ordinary skill in the art," Appx15, the Board misapprehended that a skilled artisan would understand the inventor's disclosure of solder pads on the bottom of his microelectronics package to be for attachment via reflow to a user's board.

Moreover, the record establishes that there are only a few other soldering methods at issue (*e.g.*, "hand" and "wave" soldering). *See* Appx671. At the outset, hand soldering would not achieve the inventor's stated purpose of reducing "lead time, cost, and tooling." Appx250 (1:31–33). In wave soldering, "printed boards are brought in contact with the surface of continuously flowing and circulating solder." Appx1691. Such a process would destroy the inventor's microphone, as unlike a hermetically-sealed device, the inventor's microphone contains an acoustic port 44, which is open to the outside world. Appx251 (4:35–46). But in any event, hand and wave soldering are primarily used for devices with "[f]eed-through connectors," such as pins. Appx671.

*Second*, the intrinsic evidence teaches explicitly the "guides or 'blaze marks,'" *Ariad*, 598 F.3d at 1348, that the inventor's solder pads on the bottom of his package were to be used for attachment via solder reflow. The very title of the patent is "Microelectromechanical System *Package* with

Environmental and Interference Shield." Appx250 (emphasis added). The "Technical Field" makes explicit that the invention is directed toward a "microelectromechanical system *package*." *Id.* (1:9–10). After describing the inventor's package at length, the written description explains that "[t]he substrate 14 further comprises ***solder pads*** 31 for electrical connection to an end user's board," Appx251 (4:2–4), where the solder pads are on the ***bottom*** of the inventor's package, Appx249 (Fig. 3); *see also* Appx251 (3:4–8) (inventor chose package elements to achieve "a better match of thermal coefficients"). But the Board never undertakes any analysis about what the location of these solder pads on the inventor's package conveys to a skilled artisan.

As the specification goes on to explain, these solder pads enable the package to "be mounted" on an end user's printed circuit board (PCB) with a smaller footprint than other prior art package designs, such a plastic body/lead frame design, where "a gull wing configuration would be used in which the leads widen the overall foot print." Appx251 (3:3–16). That is, the invention is not drawn to pins or feed-through connectors, which, as discussed earlier, can be used with the other soldering methods of record.

69

A skilled artisan would understand that the inventor's package with *solder pads* on the *bottom* is for attachment to a user's board via solder reflow.

Given these blaze marks, the Board errs in claiming that "the present Specification merely discloses a *genus*—solder pads that are capable of being connected to a board" but fails to disclose a "newly claimed *species* of such pads—pads that are connectable to a board specifically by using a reflow process." Appx14 (citing *Purdue Pharma L.P. v. Faulding Inc.*, 230 F.3d 1320, 1326 (Fed. Cir. 2000)). The Board incorrectly contends that claiming solder pads that are connectable via solder reflow is akin to "disclos[ing] a forest in the original application, and then later pick[ing] a tree out of the forest and say here is my invention." Appx13 (citation omitted).  The analogy is wholly inappropriate.

In *Purdue Pharma L.P.*, a patentee sought to claim a method of pharmaceutical treatment based on pharmacokinetic characteristics that were not disclosed in the specification or known in the art. 230 F.3d at 1324–1326. The Court held that what the patentee had "done is to pick a characteristic possessed by two of their formulations, a characteristic that is not discussed even in passing in the disclosure, and then make it the basis of claims that cover not just those two formulations, but any formulation

that has that characteristic." *Id.* at 1327. Respectfully, that has no application here.

Most importantly, what the Board missed in raising its newly-advanced genus-species argument is that a *skilled artisan* would understand the inventor to be using "solder pads" capable of standard solder reflow—one of a handful of soldering types—for attachment to a board. As this Court has held, a few trees (*e.g.*, soldering methods) do not make a forest. *See Atofina v. Great Lakes Chem. Corp.*, 441 F.3d 991, 999 (Fed. Cir. 2006) ("a very small genus can be a disclosure of each species within the genus"); *see also Bristol-Myers Squibb Co. v. Ben Venue Labs., Inc.*, 246 F.3d 1368, 1380 (Fed. Cir. 2001) (similar).

Here, the record evidence establishes that there are only a few relevant soldering methods (*i.e.*, "hand," "wave," and "reflow" soldering). As noted above, *see supra* at 68, hand and wave soldering are primarily used for devices with "[f]eed-through connectors," such as pins, whereas as "reflow heating methods" are used, as here, for "[s]urface [m]ount connectors," such as pads. *See* Appx671. There is no record basis for the Board's finding of a vast "forest" of soldering methods. *See Ineos USA LLC v. Berry Plastics Corp.*, 783 F.3d 865, 872 (Fed. Cir. 2015) (the appellant

71

"provided no detailed information on how large this genus is to support its contention that this genus does not disclose behenamide"). To the contrary, the Board elsewhere recognized "that solder reflow is [] *one* of multiple *specific methods* or species." Appx14 (emphasis added). A skilled artisan plainly would understand that the inventor's package was intended to be reflowed to a user's board.

*Finally*, while the Board's failure to consider the extensive extrinsic evidence and full intrinsic evidence alone warrants reversal, the Board's remaining analysis is fundamentally flawed in conflating apparatus and method claims and in focusing on *other* methods of soldering, rather than simply asking whether a skilled artisan would have understood the inventor to be utilizing solder pads suitable for reflow.

At the outset, in stating that "the Specification merely sets forth solder pads for connection to a separate printed circuit board without expressly stating that the solder pads are connected," Appx11, there cannot be *any* dispute that providing "*solder* pads for connection" tells the reader the pads will be soldered. The Board's analysis then incorrectly focuses on whether "a solder pad can be connected to an external board by methods *other* than a solder reflow process." Appx13 (emphasis added). This inquiry

is largely irrelevant to the written description question at issue: whether the disclosure of solder pads on *the bottom of the package* for electrical connection to an end user's board "reasonably conveys," *Ariad*, 598 F.3d at 1355, that the inventor was in possession of solder pads "*configured*" for use with a solder reflow process.

The Board's analysis proceeds in two disjointed steps: (a) there are ways to connect solder pads other than solder reflow; and (b) thus, the disclosure of solder pads in the specification "is not an inherent disclosure of a solder pad that is capable of connection to a printed circuit board using a solder reflow process." Appx13–14. Respectfully, that other methods of soldering exist says nothing about whether a skilled artisan reading the specification would understand that the inventor was referencing solder pads suitable for commercial solder reflow in attaching to a board. Indeed, despite these other soldering methods, the Examiner found that "[i]t is *inherent* that the solder pads of Halteren are suitable for solder reflow,"Appx3766, even where Halteren discloses only *contact* pads and never states they are to be used with solder reflow.

Thus, the only analysis that the Board actually did incorrectly requires a "disclosed reflow solder *process*" to provide written description

support for *apparatus* claims, Appx14 (emphasis added), without

addressing the evidence regarding a skilled artisan's understanding of the

inventor's solder pads on the bottom of his package. The question the

Board should have addressed is whether the specification discloses to a

skilled artisan solder pads *suitable* for use with solder reflow. *See*

*Microprocessor Enhancement Corp. v. Texas Instruments*, 520 F.3d 1367, 1375

(Fed. Cir. 2008) (an apparatus claim may recite that the apparatus is

"*capable of* performing the recited functions," without reciting a "method of

use of that apparatus").

And as discussed *supra*, that inquiry must examine what "the

disclosure of the application relied upon *reasonably conveys* to those *skilled*

*in the art*," *Ariad Pharm.*, 598 F.3d at 1351 (emphasis added), in view of the

"state of the art at the time of filing," and "prior art knowledge," *id.* at 1358.

Despite Knowles's repeated requests that the Board consider what the

location of the solder pads on the package and their intended use

"reasonably conveys" to a skilled artisan, Appx5199–5201, Appx6914–6915,

the Board wholly failed to do so. The Board's decision must be reversed.

## IV.  The Record Does Not Establish that the Cirrus Entities are Proper Parties, Requiring Vacatur and/or Remand.

As discussed *supra* at 40–41, Knowles moved to vacate and remand

because the record does not establish that Cirrus Inc. and Cirrus UK (the

"Cirrus Entities") are proper parties. *See* Dkt. Nos. 23-1, 32. The Court

denied the motion, but stated that "[t]o the extent that Knowles wishes to

challenge the Board's decision to name the Cirrus Entities as third party

requesters, Knowles may raise its arguments in its opening brief." Dkt. No.

33.

Respectfully, and for purposes of preserving further review, Knowles

accordingly requests that the Court ""hold unlawful and set aside," 5

U.S.C. § 706, the agency's decision, "without prejudice to Knowles being

able to pursue all original grounds for appeal, upon resolution of this

threshold issue," Dkt. No. 32 at 5, or expeditiously remand this matter, Dkt.

No. 23-1 at 20, in both cases because the record does not establish that the

Cirrus Entities constitute the third-party requester, such that they may not

participate in proceedings before the Board and this Court.

The Patent Act provides that a "third party requester . . . (2) may,

subject to subsection (c), be a party to any appeal taken by the patent

owner under the provision of section 134 or sections 141 through 144." 35 U.S.C. § 315(b) (2010) (emphasis added); *see also id.* § 141. Section 100(e) defines "third-party requester" to "mean 'a person requesting ex parte reexamination under section 302 or inter partes reexamination under section 311 who is not the patent owner.'" *Agilent*, 811 F.3d at 1332 . Analyzing 35 U.S.C. § 315(b), 141, and 100(e), *Agilent* held that being a privy is insufficient to participate: "Because Congress explicitly provided for appeals of reexaminations by third-party requesters but not privies, we conclude that, based on the unambiguous language of the statutes, mere privies lack a cause of action to appeal." *Agilent*, 811 F.3d at 1331.

Wolfson PLC filed the reexamination request here. Appx7276–7277. On June 23, 2015, a notice was filed stating that Wolfson PLC "was acquired by Cirrus Logic, Inc." and the "new Real Party-in-Interest is" Cirrus Inc. and Cirrus UK, Appx14373, ten months after the deadline for providing such information, *see* 37 C.F.R. § 41.8(a). A supplemental notice was then filed stating that Wolfson PLC "became a wholly owned subsidiary of Cirrus Logic, Inc." and "changed its name and is now" Cirrus UK. Appx14418. These entities requested to participate at oral argument before the Board, *see* Appx14392–14393; Knowles objected at length, *see*

Appx14411–14412. The Board rejected Knowles's challenge, ruling that

Knowles was not entitled to oppose and that "if Requesters attend the oral

hearing, . . . it will up [sic] to the discretion of the panel if they would like

to *sua sponte* ask Requesters any questions that they may have with regard

to either the appeal or the Notice of Change in real party-in-interest."

Appx14440.

Before this Court, Cirrus opposed Knowles's motion, filing extensive

extra-record documents and declarations, and arguing that the "re-

registration of Wolfson PLC, under the [UK] Companies Act 2006" as a

"private company . . . under the name Wolfson LTD," and a subsequent

name change, means that, "[n]otwithstanding the acquisition, re-

registration . . . [and] name changes," "Cirrus UK LTD is the same legal

entity," Dkt. No. 29 at 15.

As noted in Knowles's reply, *see* Dkt. No. 32, Cirrus Inc. remains a

wholly improper party. Cirrus asserts, at most, that Cirrus Inc. is a privy to

Cirrus UK. As *Agilent* makes explicit, *see* 811 F.3d at 1331, being a privy

does not qualify Cirrus Inc. to be the "third party requester" authorized to

participate in proceedings below and this appeal under Sections 315(b),

100(e), and 141.

Regarding Cirrus UK, none of the extra-record declarations and documents submitted by Cirrus may be considered. In *Agilent*, the Court held that the question of who constitutes the third-party requester is neither a jurisdictional nor Article III question. 811 F.3d at 1330. Accordingly, "Section 144 . . . provides that we [the Court] must review Board decisions 'on the record' developed by the PTO," *In re Gartside*, 203 F.3d 1305, 1313 (Fed. Cir. 2000) (emphasis added), precluding such materials. Nor, in any event, would such materials relating to foreign law be a proper subject of judicial notice. *See* Fed. R. Evid. 201(b)(1) (directed to "a fact . . . generally known within the trial court's *territorial jurisdiction*") (emphasis added). Questions of foreign law must be addressed by the lower tribunal, through expert evidence, in the first instance. *See Merck & Co. v. U.S. Int'l. Trade Comm'n*, 774 F.2d 483, 488 (Fed. Cir. 1985); *Akazawa v. Link New Tech. Int'l, Inc.*, 520 F.3d 1354, 1358 (Fed. Cir. 2008). Regardless, these materials still do not establish what "re-registration" under the U.K. Companies Act 2006 means, with regard to whether such "re-registration" is akin to a dissolution and asset sale under U.S. law, in which case Cirrus UK LTD would not be a proper party, or is akin to a name change, as Cirrus posits. Respectfully, Knowles submits that the above statutes

require that a reviewing court find error in allowing the Cirrus Entities to participate absent evidence in the administrative record, and that vacatur and/or remand is required.

## CONCLUSION

For the foregoing reasons, the Court should vacate and remand.

Respectfully submitted,

/s/ Brian G. Bieluch
Brian G. Bieluch
Richard L. Rainey
Michael S. Sawyer
Cyril Djoukeng
COVINGTON & BURLING LLP
One CityCenter
850 Tenth Street, NW
Washington, DC 2001-4956
Tel: (202) 662-6000
*rrainey@cov.com*
*bbieluch@cov.com*
*msawyer@cov.com*
*cdjoukeng@cov.com*

## Proof of Service

I hereby certify that on October 28, 2016, the foregoing APPELLANT

KNOWLES ELECTRONICS LLC'S PRINCIPAL BRIEF was filed with the

Clerk of the Court for the United States Court of Appeals for the Federal

Circuit using the appellate CM/ECF system which pursuant to Federal

Rule of Appellate Procedure 25(c)(2) and Federal Circuit Rule 25(e)(1)

constitutes service on all parties represented by attorneys who have

registered for the CM/ECF system.


Dated: October 28, 2016          By: /s/Brian G. Bieluch_____
                                     Brian G. Bieluch

## Certificate of Compliance
## with Type-Volume Limitation, Typeface Requirements,
## and Type Style Requirements

The undersigned hereby certifies that this brief complies with the type-volume limitation of Federal Rule of Appellate Procedure 28.1(e)(2)(B)(i). The brief contains 13,951 words, excluding the parts of the brief exempted by Federal Rule of Appellate Procedure 32(a)(7)(B)(iii) and Federal Circuit Rule 32(b).

The undersigned also hereby certifies that this brief complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) and the type style requirements of Federal Rule of Appellate Procedure 32(a)(6). The brief has been prepared in a proportionally spaced typeface using Microsoft Office Word 2010 in 14-point Book Antiqua type style, with 14-point or larger Book Antiqua type style headings.

As permitted by Federal Rule of Appellate Procedure 32(a)(7)(C)(i), the undersigned has relied upon the word count of this word processing system in preparing this certificate.

Dated: October 28, 2016          By: /s/ Brian G. Bieluch
                                      Brian G. Bieluch

# ADDENDUM



# UNITED STATES PATENT AND TRADEMARK OFFICE

**UNITED STATES DEPARTMENT OF COMMERCE**
**United States Patent and Trademark Office**
Address: COMMISSIONER FOR PATENTS
P.O. Box 1450
Alexandria, Virginia 22313-1450
www.uspto.gov

| APPLICATION NO. | FILING DATE | FIRST NAMED INVENTOR | ATTORNEY DOCKET NO. | CONFIRMATION NO. |
|---|---|---|---|---|
| 95/000,509 | 10/07/2009 | 6781231 | 552681 | 5895 |

30954          7590          09/09/2015
LATHROP & GAGE LLP
2345 GRAND Boulevard
SUITE 2400
KANSAS CITY, MO 64108

| EXAMINER |
|---|
| ANDUJAR, LEONARDO |

| ART UNIT | PAPER NUMBER |
|---|---|
| 3992 | |

| MAIL DATE | DELIVERY MODE |
|---|---|
| 09/09/2015 | PAPER |

**Please find below and/or attached an Office communication concerning this application or proceeding.**

The time period for reply, if any, is set in the attached communication.

PTOL-90A (Rev. 04/07)

UNITED STATES PATENT AND TRADEMARK OFFICE

———————

BEFORE THE PATENT TRIAL AND APPEAL BOARD

———————

CIRRUS LOGIC, INC. and CIRRUS LOGIC INT'L (UK) LTD.
Third Party Requesters and Respondents
and
BSE CO., LTD.
Third Party Requester and Respondent

v.

KNOWLES ELECTRONICS LLC
Patent Owner and Appellant

———————

Appeal 2015-004342
Merged *Inter Partes* Reexamination Control Nos. 95/000,509,
95/001,251, and 95/001,363
Patent US 6,781,231 B2
Technology Center 3900

———————

Before JAMES T. MOORE, BRADLEY W. BAUMEISTER, and
ANDREW J. DILLON, *Administrative Patent Judges*.

BAUMEISTER, *Administrative Patent Judge*.

DECISION ON APPEAL

Appeal 2015-004342
Merged *Inter Partes* Reexamination Control Nos. 95/000, 509, 95/001,251,
and 95/001,363
US Patent No. 6,781,231 B2

# SUMMARY

## *Background*

This proceeding arose from three requests for *inter partes*
reexamination of US Patent 6,781,231 B2, which is entitled
"MICROELECROMECHANICAL SYSTEM PACKAGE WITH
ENVIRONMENTAL AND INTERFERENCE SHIELD" (issued to Anthony
D. Minervini on Aug. 24, 2004 from Application 10/238,256, filed Sept. 10,
2002) ("the '231 Minervini Patent").[1]  *Inter partes* reexamination request
95/000,509 was filed October 7, 2009 by Requester Analog Devices, Inc.
("Analog Device's '509 Request").  Corrected *inter partes* reexamination
request 95/001,251 was filed November 24, 2009 by Wolfson
Microelectronics plc, now Cirrus Logic, Inc. and Cirrus Logic International
(UK) Ltd. (collectively "Cirrus" and "Cirrus's '1251 Request").  Corrected
*inter partes* reexamination request 95/001,363 was filed June 30, 2010 by
BSE Co., LTD. ("BSE's '1363 Request").  The USPTO subsequently
merged these three requests.  *See* Decision, *sua sponte,* to Merge
Reexamination Proceedings, mailed Dec. 28, 2010.

According to Owner, the '231 Patent is also the subject to five other
proceedings (PO App. Br. 1): (1) *Knowles Electronics LLC v. Akustica Inc.*,
2:06cv527 (ED Tex) (dismissed without prejudice); (2) *In Re Silicon
Microphone Packages and Products Containing the Same,* Inv. No. 337-TA-
629 (ITC) (commission issued Limited Exclusion Order (LEO) based in part
on infringement and validity of Minervini '231 claims 1 and 2); (3) *MEMS*

---

[1] Knowles Electronics LLC is asserted to be the real party in interest.
PO App. Br. 1, dated July 1, 2014.

Appeal 2015-004342
Merged *Inter Partes* Reexamination Control Nos. 95/000, 509, 95/001,251,
and 95/001,363
US Patent No. 6,781,231 B2

*Technology Berhad v. Int'l Trade Comm'n and Knowles Electronics LLC*,
2010-1018 (Federal Circuit) (affirmed LEO in ITC Inv.); (4) *Knowels*
*Electronics LLC v. Analog Devices Inc*, 1:09cv6238 (ND ILL) (dismissed
without prejudice); (5) *In Re Certain Silicon Microphone Packages and*
*Products Containing the Same*, Inv. No. 337-TA-695 (ITC) (commission
found no violation based in part on finding claim 1 of Minervini '231
invalid). To the extent these proceedings are persuasive, we have considered
them.

For reasons explained more fully below, the Examiner conducting the
merged reexamination proceeding ultimately rejected claims 1–4 and 23–27
and confirmed claims 5–22.  RAN 1.[2]  Owner timely appealed.  *See*
*generally* PO App. Br.  Requesters Cirrus and BSE filed Respondent Briefs.
*See generally* Cirrus Resp. Br. and BSE Resp. Br.  Requester Analog
Devices did not file a respondent brief.

We are aware of the papers styled "Citation of Supplemental Federal
Circuit Authority" filed August 17, 2015; "Amended Citation of
Supplemental Federal Circuit Authority" filed August 18, 2015; and the
response thereto filed August 28.

---

[2] In addition to the above-mentioned Requests, we also refer to various other
documents throughout this Opinion, including (1) the Right of Appeal
Notice, mailed March 19, 2014 ("RAN"); (2) Patent Owner's Amended
Appeal Brief, filed July 1, 2014 ("PO App. Br."); (3) Requester Cirrus's
Respondent Brief, filed July 15, 2014 ("Cirrus Resp. Br."); (4) Requester
BSE's Respondent Brief, filed July 31, 2014 ("BSE Resp. Br.");  (5) the
Examiner's Answer, mailed September 24, 2014 (incorporating the RAN by
reference) ("Ans."); and (6) Patent Owner's Rebuttal Brief, filed October 24,
2014 (PO Reb. Br.").

Appeal 2015-004342
Merged *Inter Partes* Reexamination Control Nos. 95/000, 509, 95/001,251,
and 95/001,363
US Patent No. 6,781,231 B2

We have jurisdiction under 35 U.S.C. §§ 134 and 315. We review the
appealed rejections for error based upon the issues identified by Appellants,
and in light of the arguments and evidence produced thereon. *Cf. Ex parte
Frye*, 94 USPQ2d 1072, 1075 (BPAI 2010) (precedential) (citing *In re
Oetiker*, 977 F.2d 1443, 1445 (Fed. Cir. 1992)).

An oral hearing was conducted July 22, 2015. The hearing transcript
(Tr.) was entered into the record August 20, 2015.

We affirm.

### The Invention and Claims

The '231 Patent describes the invention as follows:

A microelectromechanical system package has a
microelectromechanical system microphone, a substrate, and a
cover. The substrate has a surface for supporting the
microelectromechanical microphone. The cover includes a
conductive layer having a center portion bounded by a
peripheral edge portion. A housing is formed by connecting the
peripheral edge portion of the cover to the substrate. The center
portion of the cover is spaced from the surface of the substrate
to accommodate the microelectromechanical system
microphone. The housing includes an acoustic port for
allowing an acoustic signal to reach the microelectromechanical
system microphone.

Abstract.

Independent claim 1 is illustrative of the appealed claims:

1.     A microelectromechanical system package comprising:

a microelectromechanical system microphone;

a substrate comprising a surface for supporting the
microelectromechanical microphone;

Appeal 2015-004342
Merged *Inter Partes* Reexamination Control Nos. 95/000, 509, 95/001,251,
and 95/001,363
US Patent No. 6,781,231 B2

> a cover comprising a conductive layer having a center portion bounded by a peripheral edge portion; and

> a housing formed by connecting the peripheral edge portion of the cover to the substrate, the center portion of the cover spaced from the surface of the substrate to accommodate the microelectromechanical system microphone, the housing including an acoustic port for allowing an acoustic signal to reach the micro electromechanical system microphone wherein the housing provides protection from an interference signal.

*The Rejections*

1.   Claims 24–27 stand rejected under 35 U.S.C. § 314(a) as enlarging the scope of the claims of the patent being reexamined.  RAN 15–16.

2.   Claims 23–27 stand rejected under 35 U.S.C. § 112, ¶ 1, for lacking adequate written description.  RAN 16–17.

3.   Various combinations of all of claims 1–4 and 23–27 stand rejected as unpatentable under 35 U.S.C. §§ 102 and 103 based upon approximately 39 combinations of multiple prior-art references.  *See* RAN 18–37 (setting forth the seven adopted rejections that were proposed by Requester Analog Devices in the '509 Request); RAN 37-66 (setting forth the nine adopted rejections that were proposed by Requester Cirrus in the '1,251 Request); and RAN 67–113 (setting forth the 23 adopted rejections that were proposed by Requester BSE in the '1,363 Request).  These adopted art-based rejections include the rejection of claims 1–4, 23, 24, 26, and 27 under 35 U.S.C. § 102(b) as being anticipated by van Halteren (WO 01/414497 A1; published June 7, 2001).

Appeal 2015-004342
Merged *Inter Partes* Reexamination Control Nos. 95/000, 509, 95/001,251, and 95/001,363
US Patent No. 6,781,231 B2

## THE REJECTION UNDER 35 U.S.C. § 314

"Claims 24–27 are rejected under 35 U.S.C. § 314(a) as enlarging the scope of the claims of the patent being reexamined." RAN 15. Independent claim 24, newly added during the reexamination proceeding (*see* Amendments and Response, filed June 18, 2012), is illustrative of the claims subject to this rejection:

> 24.    A micro electromechanical system package comprising:
>
> a microelectromechanical system microphone;
>
> a cover comprising a conductive layer having a center portion bounded by a peripheral edge portion; and
>
> a substrate comprising:
>
> > an upper surface for supporting the microelectromechanical system microphone, the upper surface comprising:
> >
> > > an inner portion comprising a plurality of bond pads electrically connected to the microelectromechanical system microphone; and
> > >
> > > an outer portion configured to electrically and mechanically attach to the cover; and
> >
> > a lower surface, the lower surface comprising a plurality of solder pads configured to mechanically attach and electrically connect the package to a surface of an external printed circuit board using a solder reflow process;
>
> wherein the peripheral edge portion of the cover and the outer portion of the upper surface of the substrate are electrically and mechanically attached to form a housing, the center portion of the cover being spaced from the upper surface of the substrate to accommodate the microelectromechanical system microphone, the housing capable of providing protection from an interference signal and further comprising at

Appeal 2015-004342
Merged *Inter Partes* Reexamination Control Nos. 95/000, 509, 95/001,251, and 95/001,363
US Patent No. 6,781,231 B2

> least one acoustic port for allowing an acoustic signal to reach the microelectromechanical system microphone.

## Contentions

The Examiner concludes that claims 24–27 improperly broaden the scope of the patent claims because these newly added claims omit the limitation of a chamber—a limitation that appears in each of independent patent claims 2–4. RAN 15–16. The Examiner also finds that claim 24 omits limitations of independent claim 5, relating to the first and second metal cup with an interposed environmental barrier (RAN 122), as well as the limitation of independent claim 4 relating to the acoustic ports along a surface of a cover (RAN 122–23).

Owner argues that it is irrelevant whether newly added claim 24 is broader than original claims 2–4 because claims 2–4 are narrower than at least original claim 1, and "the Examiner has never identified any elements of Claim 1 that are not also found in Claim 24." PO App. Br. 54.

The Examiner does not dispute that claim 1 is broader than claims 2–4. *See, e.g.,* RAN 15–16. Rather, with respect to claim 1, the Examiner summarily concludes without explanation that "the Patent owner has also changed the language used in claim 1 in a number of ways that raise further questions as to whether claim 24 broadens the scope of claim 1." RAN 15.

## Principles of Law

The Federal Circuit's oft-quoted standard for broadening is as follows:

> A claim of a reissue application is broader in scope than the original claims if it contains within its scope any

Appeal 2015-004342
Merged *Inter Partes* Reexamination Control Nos. 95/000, 509, 95/001,251, and 95/001,363
US Patent No. 6,781,231 B2

> conceivable apparatus or process [that] would not have infringed the original patent. *In re Self*, 671 F.2d 1344 (CCPA 1982); *In re Ruth*, 278 F.2d 729 (CCPA 1960). A reissue claim that is broader in any respect is considered to be broader than the original claims even though it may be narrower in other respects. *In re Bennett*, 766 F.2d 524 (Fed.Cir.1985); *Ball Corp. v. United States*, 729 F.2d 1429 (Fed.Cir.1984).

*Tilloston, Ltd. V. Walbro Corp.*, 831 F.2d 1033, 1037 n.2 (Fed. Cir. 1987).

The same broadening test is applied to claims in reexamination.

*Anderson v. International Eng'g & Mfg.*, 160 F.3d at 1349.

*Analysis*

The Examiner's summary conclusion regarding the breadth of claim 24 relative to that of claim 1 is not supported by any facts or a technical rationale. Furthermore, our review of the claims fails to evince any limitations of claim 1 that are absent from claim 24. As such, the Examiner has failed to establish that claim 24 contains within its scope any conceivable apparatus that would not have infringed the original patent. Accordingly, the Examiner has not established that independent claim 24 or dependent claims 25–27 improperly enlarge the scope of the originally filed claims.

Requester Cirrus does assert that numerous differences exist between newly added claim 24 and original claim 1:

> There are numerous differences in the language between claim 1 and claim 24. For example, the "housing" is positively recited as an element in claim 1, but is only indirectly referenced in claim 24. The peripheral portion of the cover is *connected* to the substrate in claim 1, while in claim 24, the peripheral portion of the cover is electrically and mechanically

8

Appeal 2015-004342
Merged *Inter Partes* Reexamination Control Nos. 95/000, 509, 95/001,251, and 95/001,363
US Patent No. 6,781,231 B2

> *attached* to the substrate. Furthermore, the term "an acoustic port" in claim 1 has been changed to "at least one acoustic port," in claim 24. In claim 1, the housing "provides protection," while claim 24 merely states that the indirectly recited housing is "capable of" protecting. These different terms do not necessarily have the same meaning, raising doubt as to whether the claims have the same scope and raising substantial questions as to whether claim 24 is broader in these respects, as there are reasonable constructions of these terms that result in claim 24 being broader in scope than claim 1.

Cirrus Resp. Br. 19.

At oral argument, Requester Cirrus elaborated on this argument. According to Requester Cirrus, the fact that claim 24 uses different words than does claim 1 raises a presumption that Owner intends the scope of claim 24 to be different from that of claim 1. Tr. 42. Cirrus further argues that by not sustaining the broadening rejection, the Board would enable Owner to argue later during litigation that claim 24 is broader than claim 1. *Id.*

Requester Cirrus is correct that differences in claims' respective wording may raise a presumption that different claim scopes are intended, but this presumption is not irrebuttable. In the present case, Cirrus has not provided sufficient evidence that any of the differences in wording reasonably may be interpreted as intending to establish different claim scopes. For example, Cirrus has not provided sufficient evidence that claim 1's term "connected" is any narrower than claim 24's term "attached." We find no persuasive evidence that either term is limited to a *direct* mechanical or electrical connection or attachment. Rather, both of the terms appear to

9

be synonymous, encompassing *indirect* connections and attachments, as well.

In summary, Requester has not provided any reasonable examples of subject matter that would infringe newly added claim 24 but not infringe original claim 1. Cirrus merely demonstrates that the original and new claims do not employ identical terminology. However, the claimed subject matter need not be described "*in haec verba*" in the original specification in order to satisfy the written description requirement. *In re Wright*, 866 F.2d 422, 425 (Fed. Cir. 1989). Accordingly, Cirrus's arguments are not persuasive.

For these reasons, we do not sustain the rejection of claims 24–27 under 35 U.S.C. § 314(a) for enlarging the scope of the claims of the patent being reexamined.

## THE REJECTION UNDER 35 U.S.C. § 112, ¶ 1

Claims 23–27 stand rejected under 35 U.S.C. § 112, ¶ 1, for lacking adequate written description in the Specification. The language of each claim that is found to be lacking adequate written description is "wherein the solder pads are configured to mechanically attach and electrically connect the package to a surface of an external printed circuit board using a solder reflow process" ("the reflow limitation"). RAN 16–18.

Owner does not dispute that the Specification fails to recite the reflow limitation expressly. *See* PO App. Br. 49–52. Instead, the Specification merely sets forth solder pads for connection to a separate printed circuit board without expressly stating that the solder pads are connected. *See*

Appeal 2015-004342
Merged *Inter Partes* Reexamination Control Nos. 95/000, 509, 95/001,251,
and 95/001,363
US Patent No. 6,781,231 B2

'231 Patent, col. 4, ll. 2–4 ("The substrate 14 further comprises solder pads
31 for electrical connection to an end user's board").  Nonetheless, Owner
maintains that the Specification provides adequate written description
because "the disclosure 'allow[s] one skilled in the art to visualize or
recognize the identity of the subject matter purportedly described.'"
PO App. Br. 50 (citing *Enzo Biochem, Inc. v. Gen-Probe Inc.*, 323 F.3d 956,
968 (Fed. Cir. 2002)).

   Owner's statement of the law regarding the written description
requirement is taken out of context and incomplete.  The *Enzo Biochem*
court more fully explained that "The purpose of the 'written description'
requirement is broader than to merely explain how to 'make and use'; the
applicant must also convey with reasonable clarity to those skilled in the art
that, as of the filing date sought, he or she was in *possession* of the
invention." *Enzo Biochem, Inc.*, 323 F.3d 956 at 969 (citing *Vas–Cath Inc.
v. Mahurkar,* 935 F.2d 1555, 1563–64 (Fed.Cir.1991)(emphasis added).

   The *Enzo Biochem* court made the statement cited by Owner within
the context of addressing the question of whether an originally filed
specification necessarily satisfied the written description requirement simply
by virtue of the fact that the Specification provided express support for a
disputed genus claim. *Enzo Biochem, Inc.*, 323 F.3d 956 at 968.  The court
held that "[t]he appearance of mere indistinct words in a specification or a
claim, even an original claim, does not necessarily satisfy [the written
description] requirement . . . .  The disclosure must [additionally] allow one
skilled in the art to visualize or recognize the identity of the subject matter
purportedly described." *Id.*

11

Appeal 2015-004342
Merged *Inter Partes* Reexamination Control Nos. 95/000, 509, 95/001,251, and 95/001,363
US Patent No. 6,781,231 B2

The situation addressed in *Enzo Biochem* is distinguishable from the present situation. In the present appeal, Owner does not contend that a solder reflow process is the only way to connect or attach a solder pad to an external printed circuit board or contend that all solder pad materials must be capable of being connected using a solder reflow method. *See* PO App. Br. 49–52. Restated, Owner does not dispute that a solder pad can be connected to an external board by methods other than a solder reflow process. In fact, Owner appears to have added the reflow limitation specifically for the purpose of narrowing claims 23–27 so as to not encompass all solder pads that are connectable by any other solder process, and thereby attempt to achieve the further purpose of overcoming cited prior art.

> [A]t most, BGA solder pads from Yamamura '071 to Hietanen '249 would result only in a circuit board with solder pads on its lower surface, not a package with solder pads on its lower surface. More particularly, it would still be surrounded by the telephone housing 15, and as such, those solder pads would not be "configured to mechanically attach and electrically connect the package to the surface of an external printed circuit board using a solder reflow process."

Amendments and Response 35–36, filed June 18, 2012.

We therefore conclude that the Specification's disclosure of "solder pads 31 for electrical connection to an end user's board" ('231 Patent, col. 4, ll. 2–4) is not an inherent disclosure of a solder pad that is capable of connection to a printed circuit board using a solder reflow process, as recited by the claims. "Inherency, however, may not be established by probabilities or possibilities. The mere fact that a certain thing may result from a given set of circumstances is not sufficient." *In re Robertson,* 169 F.3d 743, 745

Appeal 2015-004342
Merged *Inter Partes* Reexamination Control Nos. 95/000, 509, 95/001,251,
and 95/001,363
US Patent No. 6,781,231 B2

(Fed. Cir. 1999) (citations and internal quotation marks omitted).  We
instead find that solder reflow is but one of multiple specific methods or
species for connecting solder pads to a printed circuit board.

> Owner similarly argues

> A specification need not include a detailed explanation for
> every word of a claim.  MPEP §2163(II)(A)(1) ("The absence
> of definitions or details for well-established terms or procedures
> should not be the basis of a rejection under 35 U.S.C. 112,
> para.1, for lack of adequate written description.").  Information
> which is well known in the art need not be described in detail in
> the specification.  *See* MPEP §2163(II)(A)(2) ("Generally, there
> is an inverse correlation between the level of skill and
> knowledge in the art and the specificity of disclosure necessary
> to satisfy the written description requirement.").

PO App. Br. 49–50.

These arguments are likewise unpersuasive.  The present situation is
not one wherein the Specification recites a well-established term, but fails to
provide a definition or details for the recited term.  That is, we are *not* faced
with the case that the present Specification discloses the claimed structure of
a solder pad that can be connected to a board by use of a reflow process, and
then merely fails to provide any details of what compositions and methods
can be used to undertake the disclosed reflow solder process.  Rather, the
present Specification merely discloses a genus—solder pads that are capable
of being connected to a board.  But the Specification fails completely to
disclose the newly claimed species of such pads—pads that are connectable
to a board specifically by using a reflow process.

"[O]ne cannot disclose a forest in the original application, and then
later pick a tree out of the forest and say here is my invention."  *Purdue*

Appeal 2015-004342
Merged *Inter Partes* Reexamination Control Nos. 95/000, 509, 95/001,251,
and 95/001,363
US Patent No. 6,781,231 B2

*Pharma L.P. v. Faulding Inc.*, 230 F.3d 1320, 1326 (Fed. Cir. 2000).
Rather, the Specification must provide some guides or "blaze marks" that
disclose the claimed invention "'specifically, as something appellants
actually invented.'" *Ariad Pharm., Inc. v. Eli Lilly & Co.*, 598 F.3d 1336,
1348 (Fed. Cir. 2010).

Owner further argues that the Specification provides adequate written
description for the reflow limitation because "one of ordinary skill in the art
would understand that [Minervini's package] would be connected to a
printed circuit board one of two ways—either by inserting package pins into
holes in the board or else placing the package pins or pads onto the surface
of the printed circuit board." PO App. Br. 50–51 (supporting citations
omitted). Owner then contends that "[o]ne of ordinary skill in the art would
understand that solder reflow was a well-known 'surface mount technology'
for surface mounting a package having pads." PO App. Br. 51–52
(supporting citations omitted).

This argument is not persuasive because the argument is merely
directed to what would have been understood objectively *by one of ordinary
skill in the art*. Such an argument may be relevant to proving that one of
ordinary skill would have known how to make and use the invention, and
thereby satisfy the enablement requirement of 35 U.S.C. § 112 , ¶ 1. But
that test is not applicable to the written-description prong of 35 U.S.C.
§ 112, ¶ 1. Rather, as explained above, the relevant test for the written
description prong, is whether the Specification reasonable conveys that *the
applicant*—not one of ordinary skill in the art—was in possession of the
claimed subject matter.

Appeal 2015-004342
Merged *Inter Partes* Reexamination Control Nos. 95/000, 509, 95/001,251,
and 95/001,363
US Patent No. 6,781,231 B2

To summarize, Owner has not established that the Examiner erred in
finding that the '231 Patent fails to provide adequate written description for
the reflow process limitation, newly added in claims 23–27.  Accordingly,
we sustain the Examiner's rejection of these claims.

Because we sustain the written description rejection of claims 23–27,
we need not address the further written description rejection under 35 U.S.C.
§ 112, ¶ 1, which the Examiner issued because claim 27 recites "at least one
acoustic port is located in the substrate."  RAN 18–19.  *See In re Gleave*,
560 F.3d 1331, 1338 (Fed. Cir. 2009) (not reaching other rejections after
upholding an anticipation rejection); *see also Beloit Corp. v. Valmet Oy*, 742
F.2d 1421 (Fed. Cir. 1984) (ITC can decide a single dispositive issue of
numerous resolved by the presiding officer; there is no need for the
Commission to decide all issues decided by the presiding officer).

THE ANTICIPATION REJECTION BASED UPON VAN HALTEREN

I.

*Contentions*

As noted above, independent claims 1 and 24, as well as dependent
claims 2–4, 23,  26, and 27, stand rejected under 35 U.S.C. § 102(b) as being
anticipated by Halteren.  *See, e.g.,* RAN 18–19, 34–36, 37–41, and 99.
Owner argues that the rejection is improper because van Halteren does not
disclose a "package," as required by each of the claims.

Owner points out that "van Halteren '497 discloses a 'flexible
substrate transducer assembly that integrates a transducer or transducer
system . . . and a flexible substrate.'"  PO App. Br. 18.  Owner contends that

15

Appeal 2015-004342
Merged *Inter Partes* Reexamination Control Nos. 95/000, 509, 95/001,251,
and 95/001,363
US Patent No. 6,781,231 B2

van Halteren's structure constitutes an "assembly," as opposed to a

"package." *Id.* 19.  According to Owner, one of ordinary skill in the art

would understand that "package" is a term of art having a specific meaning

(*id.* 5) and this meaning of "package" requires a second-level mechanical

and electrical connection to a printed circuit board by either through-hole or

surface mounting (*id.* 20).

Owner contends the expert testimony of Dr. Ken Gilleo describes the

meaning of "package," as it would be understood by one of ordinary skill:

> Minervini '231 Claims 1–4 all require a "package."  This term
> has a specific meaning to those of ordinary skill in the field of
> electronics packaging.  *Generally speaking*, an electronics
> package is a "housing" whose functions include protecting the
> electronics (for example, [an] integrated circuit chip or a
> microelectromechanical device) from mechanical and
> environmental stress and providing electrical interconnection.
> In order to protect the IC chip or MEMS device, most packages
> provide a full enclosure (for example, plastic encapsulation),
> although some have only a partial enclosure (for example,
> MEMS ink jet devices).   In order to provide electrical
> interconnections, the package must have a device-to-package
> electrical connection along with a package-to-printed-circuit-
> board electrical connection.  The device-to-package connection
> is referred to as the "first-level" connection and the package-to-
> printed-circuit-board connection is referred to as the "second-
> level" connection.

PO App. Br. 6 (citing Rule 1.132 Declaration of Dr. Kenneth Burton

Gilleo ¶ 5; filed Jan. 28, 2010) (the "Gilleo Decl.").

Dr. Gilleo provides the further opinion,

> A "package" is not required for every application incorporating
> an integrated circuit or MEMS device.  For example; in "chip-
> on-board" or "chip-on-flex" technology, the silicon die is

16

Appeal 2015-004342
Merged *Inter Partes* Reexamination Control Nos. 95/000, 509, 95/001,251, and 95/001,363
US Patent No. 6,781,231 B2

> mechanically and electrically connected directly to the printed circuit board instead of going through a first level device-to-package connection.  If there is only one connection level, then there is no "package."

Gilleo Decl. ¶ 6.

Based upon this narrow construction of the claim term "package,"

Owner urges

> Since nothing in van Halteren '497 suggests that its exposed contact pads were intended to be (or even could be) inserted into plated through-holes in a printed circuit board or soldered to lands on a printed circuit board, and since in fact van Halteren '497 expressly discloses a different mechanism, van Halteren '497 does not disclose the required "package."

PO App. Br. 21.

Owner additionally cites to approximately ten external references—technical handbooks, standards, and dictionaries—which all purportedly support Dr. Gilleo's position that a "package" must include first-level and second-level connections.  *Id.* 6–7.  Owner further urges that our reviewing court, considering an appeal from the International Trade Commission, has already interpreted the term "package" as used in the '231 Minervini patent to mean "a self-contained unit that has two levels of connection to the device and to the circuit or other system."  Tr. 7–8.

The Examiner finds Owner's narrow interpretation of the term "package" to be unsupported by evidence, and the Examiner therefore interprets "package" more broadly, according to the broadest-reasonable-interpretation standard.  RAN 114–15.  More specifically, the Examiner disagrees with Owner's assertion that the second level interconnection necessarily must be "accomplished only by pins inserted into the printed

Appeal 2015-004342
Merged *Inter Partes* Reexamination Control Nos. 95/000, 509, 95/001,251,
and 95/001,363
US Patent No. 6,781,231 B2

circuit board or by mounting pins or pads to the surface of the printed circuit
board." *Id.* The Examiner instead finds these two methods to be mere non-
exhaustive examples. *Id.* at 115.

*Issue*

Has Owner demonstrated sufficiently that the broadest reasonable
interpretation of the claim term "package" necessarily requires that a
second-level connection to a printed circuit board be made only by either
through-hole mounting or surface mounting?

*Analysis*

The technical references cited by Owner may well evidence that
skilled artisans *usually, or at least commonly*, understand chip packages to
possess second-level connection pins that are soldered by a through-hole or
surface mounting process. *See* PO App. Br. 9–13. However, this extrinsic
evidence does not demonstrate that chip packages *necessarily* must possess
one of these two types of second-level connections. In fact, Owner's
extrinsic evidence indicates the opposite—that the term "package" should
not be limited to such a narrow interpretation.

The passages quoted by Owner in the main brief contain various
qualifiers that indicate a chip package does not necessarily have to possess
such second-level connections. PO App. Br. 9 (citing Tummula
Fundamentals,[3] "*In general*, IC packages can be classified into two
categories: 1) through-hole, and 2) surface mount.") (emphasis added).

_____

[3] FUNDAMENTALS OF MICROSYSTEMS PACKAGING, 67 (Tummula ed., 2001).

Appeal 2015-004342
Merged *Inter Partes* Reexamination Control Nos. 95/000, 509, 95/001,251,
and 95/001,363
US Patent No. 6,781,231 B2

PO App. Br. 9–10 (citing the Tummula Handbook,[4] "There are two *basic*
types of connections between the first- and second-level packages: those
with pins, requiring plated-through-hole (PTH), and others with pins or pads
meant for surface mounting the device (SMD) by the use of Surface
Mounting Technology (SMT).") (emphasis added).  PO App. Br. 10 (citing
Pecht,[5] "The external connections of a chip carrier serve to classify the
component into one of the two *major* technological categories: through hole
components (THC) and surface mount components.") (emphasis added).

Additional extrinsic evidence cited by Owner, but not expressly
quoted in the main brief, also supports the conclusion that a "package" need
not necessarily have a through-hole or surface mount second-level
connection.  For example, Owner cites an industry standard issued by the
Electronic Industries Alliance JEDEC Solid State Technology Association.
PO App. Br. 6 (citing JDEC Standard JESD99A (Feb. 2000), "Terms,
Definitions, and Letter Symbols for Microelectronic Devices").  This JDEC
standard includes the following entry:  "**package (of a semiconductor
device):** An enclosure for one or more semiconductor chips (dice), film
elements, or other components, that allows electrical connection and
provides mechanical and environmental protection."  JDEC Standard
JESD99A, p. 1–28.

This definition provides clear evidence that the meaning of the term
"package" is not limited to chip assemblies that possess either through-hole

---

[4] MICROELECTRONICS PACKAGING HANDBOOK, 42 (Tummula et al. eds.,
1989).
[5] HANDBOOK OF ELECTRONIC PACKAGE DESIGN, 4 (Pecht ed. 1991).

Appeal 2015-004342
Merged *Inter Partes* Reexamination Control Nos. 95/000, 509, 95/001,251,
and 95/001,363
US Patent No. 6,781,231 B2

mounting or surface mounting as a means of providing second level
mechanical and electrical connection to a printed circuit board.  Rather, this
industry definition indicates that the meaning of "package" is broader—it
may refer to chip assemblies that possess any type of second-level
connection mechanism.  In fact, this industry definition provides evidence
that a package need not even necessarily include any second-level
connection at all.  According to this definition, the term "package" would
include chip assemblies that do not possess any second-level electrical
connection, such as is the case for a Radio Frequency Identification (RFID)
tag, which communicates with external devices wirelessly.

Owner additionally cites to the definition of "package" as set forth by
the Harper Dictionary:[6]

> **Package** (1) An enclosure for electronic components and
> hybrid circuits consisting of a header, a lid, and hermetically
> sealed feedthrough terminal leads.  Packages are made of metal,
> ceramic, and plastic. (2) An enclosure or housing used to
> contain any level of electronic system or subsystem.

Harper, p. 138  (cited by PO App. Br. 7).

Neither of Harper's definitions requires that a second level connection
be made to a PCB specifically by means of a through-hole mounting or
surface mounting technique.  Moreover, the second definition, which is
broader than the first, does not even require that the package possess second-
level connections.

---

[6] Charles A. Harper, ed., ELECTRICAL PACKAGING AND INTERCONNECTION
HANDBOOK, 3d, McGraw-Hill (1993).

Appeal 2015-004342
Merged *Inter Partes* Reexamination Control Nos. 95/000, 509, 95/001,251,
and 95/001,363
US Patent No. 6,781,231 B2

 To summarize, it is immaterial whether the narrow interpretation of
"package" urged by Owner might constitute a commonly accepted
definition, or even constitute the most commonly accepted definition. In
reexamination proceedings, the Board is to give claims their broadest
reasonable interpretation, consistent with the specification. *In re Yamamoto*,
740 F.2d 1569, 1571 (Fed Cir. 1984). The extrinsic evidence indicates that
under the broadest reasonable interpretation, a chip package need not
possess a second-level connection to a printed circuit board that is made
specifically by either through-hole mounting or surface mounting. Rather, a
package may be connected to an external component such as a wiring board
or printed circuit board by any electro-mechanical connection means.[7]
Accordingly, Owner has not established that the Examiner's interpretation of
the claim term "package" was improper. As such, Owner has not
established that the Examiner erred finding that van Halteren discloses a
package, as recited in the claims.

 We are likewise unpersuaded by Owner's argument that we should
give deference to the narrow interpretation of "package" that the Federal
Circuit adopted. Tr. 6. While the Board has fully considered the Circuit
Court's claim constructions, precedent makes clear that the USPTO is not
bound in reexamination proceedings by claim constructions produced by a
court. *In re Trans Texas Holdings Corp.*, 498 F.3d 1290, 1301 (2007). *See
also* Tr. 8 (wherein Owner's Counsel acknowledges that the Circuit Court's

---

[7] In fact, the extrinsic evidence additionally seems to indicate that a chip
package need not even possess any second-level connection at all. However,
we need not reach this finding to resolve the present appeal.

Appeal 2015-004342
Merged *Inter Partes* Reexamination Control Nos. 95/000, 509, 95/001,251, and 95/001,363
US Patent No. 6,781,231 B2

interpretation of "package" is not binding on the Board). As noted above, in reexamination proceedings, the Board is to give claims their broadest reasonable interpretation, consistent with the specification. *In re Yamamoto*, 740 F.2d at 1571. This standard differs from the standard that was followed by the court. *See* Tr. 8 (wherein Owner's Counsel acknowledges that the relevant standard before the Circuit Court on appeal from the decision of the International Trade Commission is the narrower District court standard—not the broadest-reasonable-interpretation standard). Accordingly, we disagree with the Patent Owner that "the Examiner must address and apply MEMS Technology's interpretation of the claim term package and conclusions regarding the Baumhauer reference." Amended Submission, August 18, 2015, page 1. Under these circumstances, Owner's request for remand of this proceeding to the Examiner (*id.*) is unnecessary and therefore denied.

II.

Owner additionally argues that van Halteren does not anticipate newly added claims 23–27 because, in addition to not disclosing a package (which we addressed in Section I, above), "[van Halteren] lacks the requisite 'solder pads' element. *See also* §7.2.1.1 [of Owner's Appeal Brief] (addressing unsuitability of van Halteren's 'contact pads' for use as 'solder pads.')." PO App. Br. 22, fn 44 [sic: 4].

In view of our having already sustained the rejection of newly added claims 23–27 under 35 U.S.C. § 112, ¶ 1, we need not reach this remaining argument. *See In re Gleave*, 560 F.3d 1331, 1338 (Fed. Cir. 2009) (not reaching other rejections after upholding an anticipation rejection); *see also Beloit Corp. v. Valmet Oy*, 742 F.2d 1421 (Fed. Cir. 1984) (ITC can decide a

Appeal 2015-004342
Merged *Inter Partes* Reexamination Control Nos. 95/000, 509, 95/001,251, and 95/001,363
US Patent No. 6,781,231 B2

single dispositive issue of numerous resolved by the presiding officer; there is no need for the Commission to decide all issues decided by the presiding officer).  We likewise do not reach any of the other remaining art-based rejections.

We instead sustain the Examiner's 102(b) anticipation rejection over van Halteren only with respect to claims 1–4.

## DECISION

The Examiner's decision rejecting claims 1–4 and 23–27 is affirmed.

In the event neither party files a request for rehearing within the time provided in 37 C.F.R. § 41.79, and this decision becomes final and appealable under 37 C.F.R. § 41.81, a party seeking judicial review must timely serve notice on the Director of the United States Patent and Trademark Office.  *See* 37 C.F.R. §§ 90.1 and 1.983.

## AFFIRMED

Appeal 2015-004342
Merged *Inter Partes* Reexamination Control Nos. 95/000, 509, 95/001,251,
and 95/001,363
US Patent No. 6,781,231 B2

Patent Owner:

LATHROP & GAGE LLP
2345 GRAND Boulevard
SUIIE 2400
KANSAS CITY, MO 64108

Third Party Requester:

SUNSTEIN KANN MURPHY & TIMBERS  LLP
125 SUMMER STREET
BOSTON, MA 02110

WOLF  GREENFIELD & SACKS, P.C.
600 ATLANTIC AVENUE
BOSTON, MA 02210

LADAS & PARRY Y. LLP
224 SOUTH MICHIGAN AVENUE
SUITE 1600
CHICAGO, IL 60604



# UNITED STATES PATENT AND TRADEMARK OFFICE

UNITED STATES DEPARTMENT OF COMMERCE
**United States Patent and Trademark Office**
Address: COMMISSIONER FOR PATENTS
P.O. Box 1450
Alexandria, Virginia 22313-1450
www.uspto.gov

| APPLICATION NO. | FILING DATE | FIRST NAMED INVENTOR | ATTORNEY DOCKET NO. | CONFIRMATION NO. |
|---|---|---|---|---|
| 95/000,509 | 10/07/2009 | 6781231 | 552681 | 5895 |

30954        7590        04/06/2016
LATHROP & GAGE LLP
2345 GRAND Boulevard
SUITE 2400
KANSAS CITY, MO 64108

| EXAMINER |
|---|
| ANDUJAR, LEONARDO |

| ART UNIT | PAPER NUMBER |
|---|---|
| 3992 | |

| MAIL DATE | DELIVERY MODE |
|---|---|
| 04/06/2016 | PAPER |

**Please find below and/or attached an Office communication concerning this application or proceeding.**

The time period for reply, if any, is set in the attached communication.

UNITED STATES PATENT AND TRADEMARK OFFICE

_____

BEFORE THE PATENT TRIAL AND APPEAL BOARD

_____

CIRRUS LOGIC, INC. and CIRRUS LOGIC INT'L (UK) LTD.
Third Party Requesters and Respondents
and
BSE Co., Ltd.
Third Party Requester and Respondent

v.

KNOWLES ELECTRONICS LLC
Patent Owner and Appellant

_____

Appeal 2015-004342
Merged *Inter Partes* Reexamination Control Nos. 95/000,509,
95/001,251, and 95/001,363
Patent US 6,781,231 B2
Technology Center 3900

_____

Before JAMES T. MOORE, BRADLEY W. BAUMEISTER, and
ANDREW J. DILLON, *Administrative Patent Judges*.

BAUMEISTER, *Administrative Patent Judge*.

DECISION ON REQUEST FOR REHEARING

Appeal 2015-004342
Merged *Inter Partes* Reexamination Control Nos. 95/000,509, 95/001,251, and 95/001,363
US Patent No. 6,781,231 B2

## SUMMARY

In our Decision on Appeal mailed September 9, 2015 ("Decision"), this Panel of the Board affirmed the Examiner's decision rejecting reexamined claims 1–4 and 23–27 of US Patent 6,781,231 B2 ("the '231 Patent"). Dec. 23. More specifically, the Board affirmed the Examiner's anticipation rejection of claims 1–4 under 35 U.S.C. § 102(b) over Halteren (US 6,324,907 B1; issued Dec. 4, 2001). Dec. 15–23; *e.g.*, RAN 37–39. The Board also affirmed the Examiner's rejection of claims 23–27 under 35 U.S.C. § 112, ¶ 1, for lacking adequate written description. Dec. 10–15; RAN 16–17.

Pursuant to 37 C.F.R. § 41.79, Patent Owner ("Owner") subsequently requested rehearing of our Decision, setting forth three specific issues. *See generally* Reh'g Req. filed October 10, 2015. In response, Third Party Requester ("Requester") responded with a paper styled, "Comments Under 35 U.S.C. § 41.79(c) In Opposition To Request For Rehearing," filed October 27, 2015 ("Opposition To Request").

Subsequent to receiving the Parties' respective briefs on rehearing, the Panel became aware—without the requisite notification from either party or from the Examiner[1]—of the existence of a related PTAB appeal.

---

[1] *See* rules 37 C.F.R. §§ 41.67(c)(1), 41.68(b)(1) (requiring parties filing appeal briefs and respondent briefs, respectively, in an *inter partes* reexamination to identify "all other prior and pending appeals . . . or judicial

2

Appeal 2015-004342
Merged *Inter Partes* Reexamination Control Nos. 95/000,509, 95/001,251, and 95/001,363
US Patent No. 6,781,231 B2

Specifically, Owner brought Appeal 2015-004989 before the PTAB ("the '4989 Appeal") in relation to an *inter partes* reexamination of US 8,018,049 B2, issued September 13, 2011 and titled "SILICON CONDENSER MICROPHONE AND MANUFACTURING METHOD" ("the '049 Patent"). The '049 Patent indicates that that patent is also issued to the present inventor, Anthony D. Minervini, and is also assigned to the present assignee, Knowles Electronics LLC.

Requester for reexamination of the '049 Patent, Analog Devices, Inc., filed a Corrected Request for Reexamination of the '049 Patent. *See* Request for Inter Partes reexamination of U.S. Patent No. 8,018,049 (filed Dec. 23, 2011 in reexamination application 95/001,850) ("the '850 Request" and "the '850 Reexamination"). The '850 Request was subsequently granted (*see* Order Granting Request for *Inter Partes* Reexamination, mailed Mar. 7, 2012), and various claims of the '049 Patent were rejected in the associated reexamination (*see* '850 Reexam., RAN 1).

---

proceedings . . . [that] may be related to, directly affect or be directly affected by or have a bearing on the Board's decision in the pending appeal." *See also* 37 C.F.R. § 41.69(a) (requiring an Examiner's Answer in an *inter partes* reexamination to make of record determinations that an appeal brief or respondent brief does not comply with Rules 41.67 and 41.68); 37 C.F.R. § 41.8(a)(2) (requiring a party filing an appeal brief to identify "within 20 days of any change during a proceeding . . . , [e]ach judicial or administrative proceeding that could affect, or be affected by, the Board proceeding").

3

Appeal 2015-004342
Merged *Inter Partes* Reexamination Control Nos. 95/000,509, 95/001,251,
and 95/001,363
US Patent No. 6,781,231 B2

One rejection includes an anticipation rejection over Halteren (*see*
'850 Reexam., RAN 5–10)—the same prior art reference at issue in the
present appeal and rehearing.  Owner appealed that rejection, among others
(*see generally*, '4989 Brief of appellant Knowles electronics LLC (filed June
17, 2014)), and therein argued, as in the present appeal, that the claim term
"package" should be interpreted narrowly and that Halteren does not
disclose a package (*id.* at 5–19).  The Panel of the '4989 Appeal rejected
Owner's claim construction of the term "package" ('4989 Decision on
Appeal (mailed Aug. 31, 2015) at 6–9), affirmed the Examiner's anticipation
rejection over Halteren (*id.* at 9–11), and denied Owner's Request for
Rehearing (*see generally* '4989 Decision on Request for Rehearing (mailed
Feb. 18, 2016)).  Owner subsequently appealed this Decision to the United
States Court of Appeals for the Federal Circuit.  *See* Patent Owner Knowles
Electronics, LLC's Notice of Appeal (filed in the '1850 Reexamination
Mar. 21, 2016).

Because neither Party brought this related appeal to the present
Panel's attention, much less presented any arguments in relation to this
related appeal, any arguments that may have been based on that Panel's
Decisions are deemed waived.  *See Hyatt v. Dudas*, 551, F.3d 1307, 1313–
14 (Fed. Cir. 2008) (the Board may treat arguments appellant failed to make
for a given ground of rejection as waived).  We instead review the appealed
rejections for error based upon the issues identified by the parties, and in

4

Appeal 2015-004342
Merged *Inter Partes* Reexamination Control Nos. 95/000,509, 95/001,251,
and 95/001,363
US Patent No. 6,781,231 B2

light of the arguments and evidence produced thereon.  *Ex parte Frye*,

94 USPQ2d 1072, 1075 (BPAI 2010) (precedential) (citing *In re Oetiker*,

977 F.2d 1443, 1445 (Fed. Cir. 1992)).

For the reasons set forth below, Owner's Request for Rehearing is

DENIED.

## THE INVENTION AND CLAIMS

The '231 Patent describes the invention as follows:

> A microelectromechanical system package has a
> microelectromechanical system microphone, a substrate, and a
> cover.  The substrate has a surface for supporting the
> microelectromechanical microphone.  The cover includes a
> conductive layer having a center portion bounded by a peripheral
> edge portion.  A housing is formed by connecting the peripheral
> edge portion of the cover to the substrate.  The center portion of
> the cover is spaced from the surface of the substrate to
> accommodate the microelectromechanical system microphone.
> The housing includes an acoustic port for allowing an acoustic
> signal to reach the microelectromechanical system microphone.

Abstract.

Independent claim 1, reproduced below with added emphasis, is

illustrative of the appealed claims:

5

Appeal 2015-004342
Merged *Inter Partes* Reexamination Control Nos. 95/000,509, 95/001,251, and 95/001,363
US Patent No. 6,781,231 B2

> 1.      A microelectromechanical system *package* comprising:
>
> a microelectromechanical system microphone;
>
> a substrate comprising a surface for supporting the microelectromechanical microphone;
>
> a cover comprising a conductive layer having a center portion bounded by a peripheral edge portion; and
>
> a housing formed by connecting the peripheral edge portion of the cover to the substrate, the center portion of the cover spaced from the surface of the substrate to accommodate the microelectromechanical system microphone, the housing including an acoustic port for allowing an acoustic signal to reach the micro electromechanical system microphone wherein the housing provides protection from an interference signal.

## PRINCIPLES OF LAW

Rule 37 C.F.R. § 41.79(b)(1) states,

> (1) [A] request for rehearing must state with particularity the points believed to have been misapprehended or overlooked in rendering the Board's opinion reflecting its decision. Arguments not raised in the briefs before the Board and evidence not previously relied upon in the briefs are not permitted in the request for rehearing except as permitted by paragraphs (b)(2) and (b)(3) of this section.

6

Appeal 2015-004342
Merged *Inter Partes* Reexamination Control Nos. 95/000,509, 95/001,251,
and 95/001,363
US Patent No. 6,781,231 B2

CONTENTIONS AND ANALYSIS

*I.*

Owner frames the first allegation of Board error as follows:

> Issue 1: The Board misapprehended and overlooked established
> tenets of claim construction and the weight of the evidence in
> interpreting the term "package" in a manner that is unreasonably
> broader than any corroborated example of the term "package" in
> the record, further failing to properly apply or distinguish the
> Federal Circuit's prior holdings interpreting this claim element.

Reh'g Req. 2.

More specifically, Owner first contends that "[t]he Board erred in
failing to credit [Owner's] extensive evidence that a person skilled in the art
would have understood the term "package" to be mountable either by
surface mounting or by through-hole mounting.  Reh'g Req. 5 (citing PO
App. Br. 9–13).

This argument is not persuasive because the Panel did not overlook
Owner's evidence submitted to show that a package must be mountable by
surface mounting or through-hole mounting.  Owner's evidence was noted
(Dec. 15–18), and the Panel explained why the broadest reasonable
interpretation of "package" *included, but was not limited to*, packages
produced from these two mounting methods (Dec. 18–22).

Owner also contends that "the Board overlooked that the record is
devoid of a *single corroborated example* of the term "package" being used
to describe a technology with any electro-mechanical connection means

7

Appeal 2015-004342
Merged *Inter Partes* Reexamination Control Nos. 95/000,509, 95/001,251,
and 95/001,363
US Patent No. 6,781,231 B2

other than surface mounting or by through-hole mounting." Reh'g Req. 5
(citing PO App. Br. 9–13) (or more simply, "other types of packages").

This argument is not persuasive. It is not dispositive whether the
record includes any prior art references that refer to other types of packages
*ipsissimis verbis* as "packages." Rather, the dispositive issue is whether the
record contains sufficient evidence to conclude that the broadest reasonable
interpretation of "package" must be limited to the narrow definition
proffered by Owner. The Decision addressed this question and set forth
evidence for the Panel's conclusion that the broadest reasonable
interpretation of "package" was *not* limited to Owner's narrow
interpretation, but instead included other types of packages. Dec. 18–22.

Owner next contends that "[t]he Board further failed to properly
address pertinent Federal Circuit precedent about the meaning of the term
'package'" in the '231 Patent. Reh'g Req. 5. Towards this end, Owner
argues that the Federal Circuit affirmed the International Trade
Commission's narrower interpretation of the '231 Patent's "package"
(Reh'g Req. 5–6), and Owner asserts that it was legal error for the Board to
reject "those aspects of the Federal circuit's construction of 'package' on the
sole ground that the Federal Circuit was not applying the broadest
reasonable interpretation standard" (Reh'g Req. 6). Owner then cites legal
precedent for the propositions that "an agency has an obligation to
'acknowledge' a 'previous judicial interpretation of a disputed claim term'

8

Appeal 2015-004342
Merged *Inter Partes* Reexamination Control Nos. 95/000,509, 95/001,251, and 95/001,363
US Patent No. 6,781,231 B2

and 'to assess whether it is consistent with the broadest reasonable construction of the term.'" Reh'g Req. 6 (citing *Power Integrations, Inc. v. Lee*, 797 F.3d 1318, 1326 (Fed. Cir. 2015).

This argument is unpersuasive. The Panel did consider and "acknowledge" the district court's interpretation of "package." Dec. 21. However, *considering and acknowledging* the court's interpretation does not mean that the Board then necessarily must *adopt* the court's interpretation. Even Owner acknowledges (1) that the circuit court applied a narrower interpretation standard than the currently applicable broadest-reasonable-interpretation standard, and (2) that the USPTO is not bound in reexamination proceedings by claim constructions produced by a court. Transcript for Oral Hearing held July 22, 2015 (entered into the record Aug. 20, 2015) at 8. Furthermore, the Decision also explained the additional evidence the Board weighed and relied upon in concluding that the term "package," as used in the '231 Patent, should be interpreted more broadly under the applicable, broadest-reasonable-interpretation standard. Dec. 15–21.

9

Appeal 2015-004342
Merged *Inter Partes* Reexamination Control Nos. 95/000,509, 95/001,251,
and 95/001,363
US Patent No. 6,781,231 B2

## *II.*

Owner frames the second allegation of Board error as follows:

Issue 2: The Board misapprehended and overlooked the fact that
Haltern fails to disclose the claimed "package," even under the
definitions of "package" that the Board relied on in rejecting
Knowles's construction.

Reh'g Req. 6.

However, Owner's supporting arguments generally are *not* directed to
this allegation. *See* Reh'g Req. 6–9. Most of the arguments of this section
are, instead, directed to the first allegation of error, discussed above—that
the claim term "package" should be afforded a narrower interpretation. *Id.;
see, e.g.*, *id.* at 6–7 (arguing that in endorsing "the Examiner's finding that
Haltern's 'flexible substrate transducer assembly' is a package[,] . . . the
Board overlooked a fundamental difference between Halteren's 'flexible'
assembly and the actual 'packages' described in Minervini '231 and the
above-cited extrinsic evidence"). To the extent that these arguments of the
second allegation of error are, in fact, directed to the noted first allegation of
error, these arguments are unpersuasive for the reasons set forth above in
*Section I.*

Owner does present one argument in this section of the Rehearing
Request that is directed to the stated second allegation: Owner argues that
"the Decision overlooked that Halteren's failure to provide a way to
mechanically attach its disclosed device to a circuit board would lead to

10

Appeal 2015-004342
Merged *Inter Partes* Reexamination Control Nos. 95/000,509, 95/001,251,
and 95/001,363
US Patent No. 6,781,231 B2

failure to provide protection from mechanical and environmental stresses."
Reh'g Req. 8; *accord* 8–9.

At the outset, we question whether this argument was timely raised.
*See* Opp. To Req. 7 (contending that this argument was not raised in
Owner's original brief). Regardless, though, this argument is unpersuasive.
As noted by Requester,

> Owner points to no evidence or legal authority that the Board
> overlooked. Owner's assertion that Halteren fails to be a
> package because it does not describe a way to mechanically
> attach its disclosed device *to a circuit board* is based entirely on
> unsupported attorney argument. Owner does not explain why
> Halteren would need to describe a way to mechanically attach its
> disclosed device to a circuit board for the Halteren device to
> provide the "mechanical and environmental protection"
> described by the JEDEC definition of package.

*Id.* (emphasis added).

In fact, Halteren does disclose that the package provides mechanical
and environmental protection. *See, e.g.*, Halteren, col. 2, ll. 57–59 ("the
term 'lid' designates various forms of covers, casings and housing that are
capable of providing the shielding from the external environment"); *see also,
id.* col. 6, ll. 29–33 ("an important issue that needs to be addressed is the
capability of the flexible substrate transducer assembly to withstand stress
forces acting on the flexible member and the attached transducer system
covered by the lid"); *accord id.* col. 6, ll. 29–64; col. 6, ll. 57–62
("potentially damaging forces are minimized by substantially rigidly

11

Appeal 2015-004342
Merged *Inter Partes* Reexamination Control Nos. 95/000,509, 95/001,251,
and 95/001,363
US Patent No. 6,781,231 B2

attaching the lid to the upper surface of the flexible elongate member to
restrain the supporting area of the flexible elongate member so as to increase
a stiffness of the supporting area").  In short, Halteren's lid does, in fact,
provide mechanical and environmental protection, including acoustic
protection.  Halteren col. 2, ll. 57–67.

### III.

Issue 3 relates to the written description rejection of new claims 23–
27, issued under 35 U.S.C, § 112, ¶ 1.  The rejection results from the new
claims' inclusion of the language "wherein the solder pads are configured to
mechanically attach and electrically connect the package to a surface of an
external printed circuit board *using a solder reflow process*" (emphasis
added).

Owner frames the third allegation of Board error as follows:

Issue 3: The Board misapprehended and overlooked established
legal precedent and critical evidence in affirming the Examiner's
decision that claims 23–27 lack written description support for
the "solder reflow" limitation.

Reh'g Req. 9.

In support of this general allegation, Owner more specifically argues
that there is no dispute that the '231 Patent discloses solder pads, that
extrinsic evidence of record makes it clear that such solder pads are meant to
use Surface Mounting Technology, and "[o]bjective evidence indicates that

12

Appeal 2015-004342
Merged *Inter Partes* Reexamination Control Nos. 95/000,509, 95/001,251,
and 95/001,363
US Patent No. 6,781,231 B2

a person skilled in the art would understand that the disclosed solder pads on
the bottom of Minervini's package would be used to surface mount a device
through reflow soldering." Reh'g Req. 9. This argument is not persuasive.

As explained in the Decision (*see e.g.*, Dec. 11, 14), evidence of what
one skilled in the art would have understood to be obvious in light of a
disclosure is relevant to the rule's requirement that a claim be enabled—not
to the rule's separate requirement that the claim possess adequate written
description. The test for whether an applicant's specification contains
adequate written description for the claimed subject matter is whether
applicant conveyed with reasonable clarity to those skilled in the art that, as
of the filing date sought, applicant was in possession of the invention. *Enzo
Biochem, Inc. v. Gen Probe Inc.*, 323 F.3d 956, 969 (Fed. Cir. 2002).

In further support of its position, Owner newly cites to three cases not
previously relied upon in the original appeal. *Cf.* Reh'g Req. 10 (citing to
*Falko-Gunter Falkner v. Inglis*, 448 F.3d 1357, 1366 (Fed. Cir. 2006) (for
the proposition that "it is unnecessary to spell out every detail of the
invention"); *Union Oil Co. v. Atl. Richfield Co.*, 208 F.3d 989, 997 (Fed. Cir.
2000) (for the proposition that "[t]he written description requirement does
not require the applicant to describe exactly the subject matter claimed");
and *LizardTech, Inc. v. Earth Resource Mapping, Inc.*, 424 F.3d 1336, 1345
(Fed. Cir. 2005) (for the proposition that "[a] claim will not be invalidated
on section 112 grounds simply because the embodiments of the specification

13

Appeal 2015-004342
Merged *Inter Partes* Reexamination Control Nos. 95/000,509, 95/001,251,
and 95/001,363
US Patent No. 6,781,231 B2

do not contain examples explicitly covering the full scope of the claim

language") *with* PO App. Br. 49–54 (addressing the written-description issue

without citing to these cases).

These cases do not support Owner's position. The present situation is

not one in which Owner failed to spell out *every* detail of the invention or

failed to describe the claimed subject matter *exactly*. Rather, the present

situation is one in which Owner failed to even mention, much less spell out

*any* detail of, the claimed reflow process used for connecting the solder

pads. As previously explained in the Decision,

> The present situation is not one wherein the specification
> recites . . . a solder pad that can be connected to a board by use
> of a reflow process, and then merely fails to provide any details
> of what compositions and methods can be used to undertake the
> disclosed reflow solder process. Rather, the present
> Specification merely discloses a genus—solder pads that are
> capable of being connected to a board. But the Specification fails
> completely to disclose the newly claimed species of such pads—
> pads that are connectable to a board specifically by using a
> reflow process.

Dec. 13.

Nor is the fact pattern of *LizardTech* on point. We agree with

Requester:

> in *LizardTech,* the specification described a [species of a]
> particular method for creating a seamless [discrete wavelet
> transform] DWT, while the claims were broad enough to cover
> [a genus that included] creating a seamless DWT using other

14

Appeal 2015-004342
Merged *Inter Partes* Reexamination Control Nos. 95/000,509, 95/001,251,
and 95/001,363
US Patent No. 6,781,231 B2

> methods. Thus, the issue in *LizardTech* is the opposite of the
> situation here where the claims at issue are *narrower* than the
> disclosure and recite a specific requirement (solder pads
> configured to connect the package to a printed circuit board using
> a solder reflow process) that is not disclosed in the specification.
> *LizardTech* has no bearing on whether claims 23–27 have written
> description support.

Opp. To Req. 13.

Owner also alleges that "[t]he Board misapprehended this
written description issue as arising under the genus-species rubric."
Reh'g Req. 14 (citing Dec. 10). According to Owner, the present
situation of where the package depicted in Fig. 3 is allegedly shown to
be surface mounted using reflow technology, "is not a situation (*e.g.*,
as sometimes arises in biotechnology and *chemical patents*) where a
patentee tries to claim a specific tree after disclosing only a forest."
Reh'g Req. 10 (emphasis added and citation omitted).

This argument is not persuasive for at least two reasons. First,
Owner presents no support for the proposition that the discussed
"genus-species rubric" is limited solely to biotechnology and chemical
patents. Secondly, even though the presently claimed package may be
used within a larger electronics system, this fact does not negate the
ultimate fact that the present dispute is, specifically, one of chemistry.
The dispute centers around the chemical composition of the disclosed
metal solder pad and whether this pad's composition is sufficiently

15

Appeal 2015-004342
Merged *Inter Partes* Reexamination Control Nos. 95/000,509, 95/001,251,
and 95/001,363
US Patent No. 6,781,231 B2

disclosed as being one capable of being used in a solder reflow

process. The composition of solder and methods of reflowing solder

are quintessentially chemical in nature.


## DECISION

Owner's Request for Rehearing is denied.


## <u>DENIED</u>

16

Appeal 2015-004342
Merged *Inter Partes* Reexamination Control Nos. 95/000,509, 95/001,251, and 95/001,363
US Patent No. 6,781,231 B2


Patent Owner:

LATHROP & GAGE LLP
2345 GRAND Boulevard
SUITE 2400
KANSAS CITY, MO 64108

Third Party Requesters:

SUNSTEIN KANN MURPHY & TIMBERS LLP
125 SUMMER STREET
BOSTON, MA 02110

WOLF GREENFIELD & SACKS, P.C.
600 ATLANTIC AVENUE
BOSTON, MA 02210

LADAS & PARRY Y. LLP
224 SOUTH MICHIGAN AVENUE
SUITE 1600
CHICAGO, IL 60604

17



US006781231B2

(12) **United States Patent**
Minervini

(10) Patent No.: **US 6,781,231 B2**
(45) Date of Patent: **Aug. 24, 2004**

(54) **MICROELECTROMECHANICAL SYSTEM PACKAGE WITH ENVIRONMENTAL AND INTERFERENCE SHIELD**

(75) Inventor: **Anthony D. Minervini**, Palos Hills, IL (US)

(73) Assignee: **Knowles Electronics LLC**, Itasca, IL (US)

( * ) Notice: Subject to any disclaimer, the term of this patent is extended or adjusted under 35 U.S.C. 154(b) by 7 days.

(21) Appl. No.: **10/238,256**

(22) Filed: **Sep. 10, 2002**

(65) **Prior Publication Data**

US 2004/0046245 A1 Mar. 11, 2004

(51) Int. Cl.⁷ ............................................. H01L 23/12
(52) U.S. Cl. .......................... 257/704; 257/724; 257/730
(58) Field of Search ............................... 257/704, 723, 257/724, 728, 729, 730, 773; 438/22, 26, 48, 106, 121, 124

(56) **References Cited**

U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 4,533,795 A | 8/1985 | Baumhauer, Jr. et al. | |
| 4,628,740 A | 12/1986 | Ueda et al. | |
| 4,776,019 A | 10/1988 | Miyatake | |
| 4,825,335 A | 4/1989 | Wilner | |
| 4,908,805 A | 3/1990 | Sprenkels et al. | |
| 4,910,840 A | 3/1990 | Sprenkels et al. | |
| 5,146,435 A | 9/1992 | Bernstein | |
| 5,151,763 A | 9/1992 | Marek et al. | |
| 5,178,015 A | 1/1993 | Loeppert et al. | |
| 5,357,807 A | * 10/1994 | Guckel et al. | ................ 73/721 |
| 5,408,731 A | 4/1995 | Berggvist et al. | |
| 5,449,909 A | 9/1995 | Kaiser et al. | |
| 5,452,268 A | 9/1995 | Bernstein | |
| 5,490,220 A | 2/1996 | Loeppert | |

| | | | |
|---|---|---|---|
| 5,506,919 A | 4/1996 | Roberts | |
| 5,531,787 A | 7/1996 | Lesinski et al. | |
| 5,592,391 A | 1/1997 | Muyshondt et al. | |
| 5,593,926 A | * 1/1997 | Fujihira | ..................... 438/114 |
| 5,740,261 A | 4/1998 | Loeppert et al. | |
| 5,748,758 A | 5/1998 | Menasco, Jr. et al. | |
| 5,831,262 A | 11/1998 | Greywall et al. | |
| 5,870,482 A | 2/1999 | Loeppert et al. | |
| 5,923,995 A | * 7/1999 | Kao et al. | ..................... 438/460 |
| 5,939,968 A | 8/1999 | Nguyen et al. | |
| 6,012,335 A | 1/2000 | Bashir et al. | |
| 6,078,245 A | 6/2000 | Fritz et al. | |
| 6,108,184 A | 8/2000 | Minervini et al. | |
| 6,191,928 B1 | 2/2001 | Rector et al. | |
| 6,282,072 B1 | 8/2001 | Minervini et al. | |
| 2002/0067663 A1 | 6/2002 | Minervini et al. | |
| 2004/0032705 A1 | * 2/2004 | Ma | ..................... 361/233 |

FOREIGN PATENT DOCUMENTS

| | | |
|---|---|---|
| EP | 0 077 615 A | 4/1983 |
| EP | 0 774 888 A3 | 5/1997 |
| WO | WO02-15636 A2 | 2/2002 |

* cited by examiner

*Primary Examiner*—Alonzo Chambliss
(74) *Attorney, Agent, or Firm*—Marshall, Gerstein & Borun LLP

(57) **ABSTRACT**

A microelectromechanical system package has a microelectromechanical system microphone, a substrate, and a cover. The substrate has a surface for supporting the microelectromechanical microphone. The cover includes a conductive layer having a center portion bounded by a peripheral edge portion. A housing is formed by connecting the peripheral edge portion of the cover to the substrate. The center portion of the cover is spaced from the surface of the substrate to accommodate the microelectromechanical system microphone. The housing includes an acoustic port for allowing an acoustic signal to reach the microelectromechanical system microphone.

**22 Claims, 2 Drawing Sheets**



# Fig. 1



# Fig. 2a



**Fig. 2b**



**Fig. 2c**



**Fig. 2d**



**Fig. 3**



Appx249

US 6,781,231 B2

1

# MICROELECTROMECHANICAL SYSTEM PACKAGE WITH ENVIRONMENTAL AND INTERFERENCE SHIELD

## TECHNICAL FIELD

The present invention relates generally to microelectromechanical systems microphones. More particularly, this invention relates to a microelectromechanical system package for providing an environmental and interference shield to a microelectromechanical system microphone.

## BACKGROUND OF THE INVENTION

There have been a number of disclosures related to building microphone elements on the surface of a silicon die. Certain of these disclosures have come in connection with the hearing aid field for the purpose of reducing the size of the hearing aid unit. While these disclosures have reduced the size of the hearing aid, they have not disclosed how to protect the transducer from outside interferences. For instance, transducers of this type are fragile and susceptible to physical damage. Furthermore, they must be protected from light and electromagnetic interferences. Moreover, they require an acoustic pressure reference to function properly. For these reasons, the silicon die must be shielded.

Some shielding practices have been used to house these devices. For instance, insulated metal cans or discs have been provided. Additionally, DIPs and small outline integrated circuit (SOIC) packages have been utilized. However, the drawbacks associated with manufacturing these housings, such as lead time, cost, and tooling, make these options undesirable.

## SUMMARY OF THE INVENTION

The present invention is related to a packaging for a microelectromechanical system (MEMS) microphone. The MEMS microphone package provides a shield for a MEMS microphone from an interference signal and/or environmental condition. The package generally comprises a MEMS microphone, a substrate and a cover.

One object of the invention is to provide such a package comprising a substrate having a surface for supporting the MEMS microphone, and a cover. The cover includes a conductive layer and a center portion bounded by a peripheral edge portion. A housing is formed by connecting the peripheral edge portion of the cover to the substrate. The center portion of the cover is spaced from the surface of the substrate to accommodate the MEMS microphone. The housing includes an acoustic port for allowing an acoustic signal to reach the MEMS microphone. The housing provides protection to the MEMS microphone from an interference signal.

Another object of the invention is to provide a MEMS package comprising a silicon-based microphone, a substrate, and a cover. The substrate includes a surface at least partially covered by a first layer of a conductive material. The silicon-based microphone is electrically coupled to the layer of a conductive material. The cover comprises a second layer of a conductive material. The cover is electrically connected to the first layer of a conductive material to provide a chamber in which the silicon-based microphone is located. The chamber provides an acoustic front volume for the silicon-based microphone.

Another object of the invention is to provide a package for a MEMS microphone. The package comprises a substrate, a

2

first layer of a conductive material, as second layer of a conductive material, and an acoustic port. The substrate is produced from a non-conductive material and includes an upper surface. The first layer of a conductive material at least partially covers the upper surface of the substrate. The second layer of a conductive material is electrically connected to the first layer of a conductive material. The second layer of a conductive material comprises a peripheral edge portion that is at least partially sealed to the substrate and a central portion spaced from the upper surface of the substrate to provide a chamber. The acoustic port allows acoustic energy to enter the chamber.

Another object of the present invention is to provide a package for MEMS microphone comprising a substrate, a first layer of a conductive material, and a cover. The substrate is produced from a non-conductive material having an upper surface. The first layer of a conductive material at least partially covers the upper surface of the substrate. The cover includes a formed metal cup electrically connected to the first layer of a conductive material. The formed metal cup comprises a peripheral edge portion at least partially sealed to the substrate and a central portion spaced from the upper surface of the substrate to provide a chamber. The acoustic port allows acoustic energy to enter the chamber.

Another object of the present invention is to provide a MEMS package comprising a MEMS microphone, a substrate, a cover, and a housing. The substrate comprises a surface for supporting the MEMS microphone. The cover has a central portion bounded by a peripheral edge, and comprises a first formed metal cup and a second metal cup fit within the first metal cup in mating relationship. The cover further comprises an environmental barrier layer disposed between the first and second metal cups. The housing is formed by connecting the peripheral edge portion of the cover to the substrate. The center portion of the cover is spaced from the surface of the substrate to accommodate the MEMS microphone. The housing includes an acoustic port for allowing an acoustic signal to reach the MEMS microphone wherein the housing provides protection from an interference signal.

Other features and advantages of the invention will be apparent from the following specification taken in conjunction with the following drawings.

## BRIEF DESCRIPTION OF THE DRAWINGS

FIG. 1 is a cross-sectional view of a MEMS package of the present invention;

FIG. 2a is a cross-sectional view of a laminated substrate portion of a MEMS package;

FIG. 2b is a plan view of a layer of the laminated substrate of FIG. 2a;

FIG. 2c is a plan view of a layer of the laminated substrate of FIG. 2a;

FIG. 2d is a plan view of a layer of the laminated substrate of FIG. 2a; and

FIG. 3 is a cross-sectional view of a substrate portion of a MEMS package.

## DETAILED DESCRIPTION OF THE PREFERRED EMBODIMENTS

While this invention is susceptible of embodiments in many different forms, there are shown in the drawings and will herein be described in detail preferred embodiments of the invention with the understanding that the present disclosure is to be considered as an exemplification of the

US 6,781,231 B2

3

principles of the invention and is not intended to limit the broad aspect of the invention to the embodiments illustrated.

The present invention is directed to microelectromechanical system (MEMS) packages. The embodiment disclosed herein would have a better match of thermal coefficients of expansion with the end user's PCB since this part would typically be mounted of FR-4 which is the same material used by end users. The present design may also eliminate the need for wire bonding that is required in plastic body/lead frame packages. The foot print is typically smaller than that would be required for a plastic body/lead frame design since the leads are formed by plating a through-hole in a circuit board of which one half will eventually form the pathway to the solder pad. In a typical plastic body/lead frame design, a gull wing configuration would be used in which the leads widen the overall foot print.

Now referring to FIG. 1, an embodiment of a MEMS package 10 of the present invention is illustrated. The MEMS package 10 of the present invention generally comprises surface mountable components 12, a substrate 14, and a cover 20. The surface mountable components 12 include MEMS devices, e.g. a transducer, a silicon-based microphone such as the silicon condenser microphones disclosed in U.S. Pat. No. 5,870,482, integrated circuits and the like.

The combination of the substrate 14 and the cover 20 forms a housing 22 in which the surface mountable components 12 are located. A peripheral edge of the cover 20 is electrically connected to the substrate 14 by a conductive adhesive, solder, or the like 23. The electrical connection may also act as a gasket to form an acoustic seal, the conductive adhesive, solder, etc. acting as a sealant. A central portion of the cover 20, located inwardly from and bounded by the peripheral edge, is spaced from the substrate 14 to accommodate the size of the surface mountable components 12.

The substrate 14 is typically formed of FR-4 material which may be processed in circuit board panel form, thus taking advantage of economies of scale in manufacturing. The substrate 14 may be formed from layers of materials, such as those used in providing circuit boards (See FIGS. 2a and 3). Accordingly, the substrate 14 generally comprises alternating layers of conductive and non-conductive materials 24, 26. The non-conductive layers 26 are typically FR-4 board. The conductive layers 24 are typically copper.

Referring to FIGS. 2a through 2d, the substrate 14 comprises a laminated, multi-layered board including layers of conductive material 24 deposited on layers of non-conductive material 26. Referring to FIG. 2b, the first layer of conductive material is used to attach wire bonds or flip chip bonds. This layer includes etched portions to define lead pads, bond pads, and ground pads. The pads would have holes drilled through them to allow the formation of plated through-holes.

As shown in FIG. 2c, a dry film 27 of non-conductive material covers the conductive material. This illustration shows the exposed bonding pads as well as an exposed ground pad. The exposed ground pad would come in electrical contact with a conductive adhesive and form the connection to ground of the cover 20 and the substrate 14.

Referring to FIG. 2d, ground layers can be embedded within the substrate 14. The hatched area represents a typical ground plane 28. The ground planes 28 do not overlap the power or output pads, but may overlap the surface mountable devices 12.

Referring to FIG. 3, an embodiment of the substrate 14 is illustrated. The substrate 14 of this embodiment includes a

4

solder mask layer 29 and alternating layers of conductive and non-conductive material 24, 26. The substrate 14 further comprises solder pads 31 for electrical connection to an end user's board.

Referring again to FIG. 1, the cover 20 is electrically connected to the substrate 14 for protection and processability. The cover 20 is produced from an outer cup 25a formed from a conductive layer of material such as copper, stainless steel, aluminum, or an alloy, such as a Cu/Ni alloy, or formed from a conductive layer plated on a ceramic, polymeric, or semiconductor material. As shown in FIG. 1, the cover 20 further includes an inner cup 25b. The inner cup 25b is also produced from a conductive layer, and likewise, can be optionally produced from a ceramic, polymeric or semiconductor material having a conductive layer deposited thereon. The inner cup 25b is somewhat smaller than the outer cup 25a so that it fits in mating relationship within the outer cup 25a.

The housing 22 includes a top portion and a bottom portion. The top portion is formed by the cover 20, and the bottom portion is formed by the substrate 14. The housing 22 forms an inner chamber 36 which is adapted for housing the surface mountable devices 12. The chamber 36 defines a front volume for a transducer when the cover 20 is acoustically sealed to the substrate 14. The chamber 36 includes an inner lining 40. The inner lining 40 is primarily formed by conductive material. It should be understood that the inner lining 40 may include portions of non-conductive material, as the conductive material may not fully cover the non-conductive material of the substrate 14. The inner lining 40 protects the surface mountable devices 12 against interference signals such as RFI signals, much like a Faraday cage.

The housing 22 also has apertures or acoustic ports 44 for receiving an acoustic signal. These acoustic ports 44 are typically located on the cover 20. The acoustic ports 44 can be located on an upper surface of the cover 20, on side surfaces of the cover 20, or in multiple locations on the upper and/or side surfaces of the cover 20. Each acoustic port 44 may contain an environmental barrier layer 48 to prevent water, particles and/or light from entering the package and damaging the internal components inside. In the embodiment illustrated in FIG. 1, the environmental barrier layer 48 is located or disposed between the outer and inner cups 25a and 25b.

The environmental barrier layer 48 is typically a microporous polymeric material formed to a film, such as a polytetrafluoroethylene (PTFE) or a sintered metal. The environmental barrier 48 is supplied for protecting the chamber 36 of the housing 22, and, consequently, the surface mountable devices 12 within the housing 22, from environmental elements such as sunlight, moisture, oil, dirt, and/or dust.

The environmental barrier layer 48 is generally sealed between two layers of conductive material 24, in this case the outer and inner cups 25a, 25b. When the environmental barrier layer 48 is sandwiched between two layers of conductive material 24, it may act as a capacitor (with electrodes defined by the metal) that can be used to filter input and output signals or the input power. The environmental barrier layer 48 may further serve as a dielectric protective layer when in contact with the conductive layers 24 in the event that the conductive layers 24 also contain thin film passive devices such as resistors and capacitors.

In addition to protecting the chamber 36 from environmental elements, the barrier layer 48 allows subsequent wet processing, board washing of the external portions of the

US 6,781,231 B2

**5**

housing 22, and electrical connection to ground from the walls via thru hole plating. The environmental barrier layer 48 also allows the order of manufacturing steps in the fabrication of the printed circuit board-based package to be modified. This advantage can be used to accommodate different termination styles.

While specific embodiments have been illustrated and described, numerous modifications come to mind without significantly departing from the spirit of the invention, and the scope of protection is only limited by the scope of the accompanying claims.

What is claimed is:

1. A microelectromechanical system package comprising:
a microelectromechanical system microphone; a substrate comprising a surface for supporting the microelectromechanical microphone;
a cover comprising a conductive layer having a center portion bounded by a peripheral edge portion; and
a housing formed by connecting the peripheral edge portion of the cover to the substrate, the center portion of the cover spaced from the surface of the substrate to accommodate the microelectromechanical system microphone, the housing including an acoustic port for allowing an acoustic signal to reach the microelectromechanical system microphone wherein the housing provides protection from an interference signal.

2. A microelectromechanical system package for providing a shield from an interference signal, the microelectromechanical package comprising:
a silicon-based microphone;
a substrate including a surface at least partially covered by a first layer of a conductive material, the silicon-based microphone is electrically coupled to the layer of a conductive material;
a cover comprising a second layer of a conductive material, the cover electrically connected to the first layer of a conductive material and providing a chamber in which the silicon-based microphone is located, the chamber providing an acoustic front volume for the silicon-based microphone.

3. A package for a microelectromechanical system microphone, the package comprising:
a substrate of a non-conductive material having an upper surface;
a first layer of a conductive material at least partially covering the upper surface of the substrate;
a second layer of a conductive material electrically connected to the first layer of a conductive material, the second layer of a conductive material comprising a peripheral edge portion at least partially sealed to the substrate and a central portion spaced from the upper surface of the substrate to provide a chamber; and
a plurality of acoustic ports for allowing acoustic energy to enter the chamber.

4. A package for a microelectromechanical system microphone, the package comprising:
a substrate of a non-conductive material having an upper surface; a first layer of a conductive material least partially covering the upper surface of the substrate;
a cover including a formed metal cup electrically connected to the first layer of a conductive material, the formed metal cup comprising a peripheral edge portion at least partially sealed to the substrate and a central portion spaced from the upper surface of the substrate to provide a chamber; and
a plurality of acoustic ports in communication with the chamber for allowing acoustic energy to enter the housing, the acoustic ports located along a surface of the cover.

**6**

5. A microelectromechanical system package comprising:
a microelectromechanical system microphone;
a substrate comprising a surface for supporting the microelectromechanical microphone;
a cover having a central portion bounded by a peripheral edge, the cover comprising a first formed metal cup and a second metal cup fit within the first metal cup in mating relationship, the cover further comprising an environmental barrier layer disposed between the first metal cup and the second metal cup; and
a housing formed by connecting the peripheral edge portion of the cover to the substrate, the center portion of the cover spaced from the surface of the substrate to accommodate the microelectromechanical system microphone, the housing including an acoustic port for allowing an acoustic signal to reach the microelectromechanical system microphone wherein the housing provides protection from an interference signal.

6. The microelectromechanical system package of claim 5 further comprising a sealant for sealing the cover to the substrate.

7. The microelectromechanical system package of claim 6 wherein the sealant is a solder.

8. The microelectromechanical system package of claim 6 wherein the sealant is a conductive adhesive.

9. The microelectromechanical system package of claim 6 further comprising a conductive layer on the substrate.

10. The microelectromechanical system package of claim 9 wherein the sealant comprises a conductive material for providing an electrical connection between the cover and the conductive layer on the substrate.

11. The microelectromechanical system package of claim 5 further comprising an environmental barrier layer within the acoustic port.

12. The microelectromechanical system package of claim 5 wherein the cover comprises a layer of non-conductive material.

13. The microelectromechanical system package of claim 12 wherein the cover comprises alternating layers of conductive and non-conductive material.

14. The microelectromechanical system package of claim 13 wherein an outer surface of the cover comprises a conductive layer.

15. The microelectromechanical system package of claim 14 wherein an inner surface of the cover comprises a conductive layer.

16. The microelectromechanical system package of claim 5 wherein the cover further comprises a non-conductive layer having a conductive layer plated thereon.

17. The microelectromechanical system package of claim 16 wherein the cover further comprises a second non-conductive layer having a second conductive layer plated thereon.

18. The microelectromechanical system package of claim 17 wherein the cover further comprises an environmental barrier layer between the conductive layer and second conductive layer.

19. The microelectromechanical system package of claim 5 wherein the microelectromechanical system microphone is a silicon-based microphone.

20. The microelectromechanical system package of claim 5 further comprising a plurality of microelectromechanical system devices supported on the surface of the substrate.

21. The microelectromechanical system package of claim 5 wherein the cover is acoustically sealed to the substrate.

22. The microelectromechanical system package of claim 5 further comprising an integrated circuit.

\* \* \* \* \*

UNITED STATES PATENT AND TRADEMARK OFFICE
# CERTIFICATE OF CORRECTION

PATENT NO.    : 6,781,231 B2                          Page 1 of 1
DATED         : August 24, 2004
INVENTOR(S)   : Anthony D. Minervini

It is certified that error appears in the above-identified patent and that said Letters Patent is
hereby corrected as shown below:

<u>Column 5,</u>
Line 56, please delete "material least" and insert -- material at least --.

Signed and Sealed this

First Day of February, 2005

JON W. DUDAS
*Director of the United States Patent and Trademark Office*

AMENDMENTS

2002—Pub. L. 107–273 made technical correction to directory language of Pub. L. 106–113, which enacted this section.

## § 314. Conduct of inter partes reexamination proceedings

(a) IN GENERAL.—Except as otherwise provided in this section, reexamination shall be conducted according to the procedures established for initial examination under the provisions of sections 132 and 133. In any inter partes reexamination proceeding under this chapter, the patent owner shall be permitted to propose any amendment to the patent and a new claim or claims, except that no proposed amended or new claim enlarging the scope of the claims of the patent shall be permitted.

(b) RESPONSE.—(1) With the exception of the inter partes reexamination request, any document filed by either the patent owner or the third-party requester shall be served on the other party. In addition, the Office shall send to the third-party requester a copy of any communication sent by the Office to the patent owner concerning the patent subject to the inter partes reexamination proceeding.

(2) Each time that the patent owner files a response to an action on the merits from the Patent and Trademark Office, the third-party requester shall have one opportunity to file written comments addressing issues raised by the action of the Office or the patent owner's response thereto, if those written comments are received by the Office within 30 days after the date of service of the patent owner's response.

(c) SPECIAL DISPATCH.—Unless otherwise provided by the Director for good cause, all inter partes reexamination proceedings under this section, including any appeal to the Board of Patent Appeals and Interferences, shall be conducted with special dispatch within the Office.

(Added Pub. L. 106–113, div. B, § 1000(a)(9) [title IV, § 4604(a)], Nov. 29, 1999, 113 Stat. 1536, 1501A–568; amended Pub. L. 107–273, div. C, title III, § 13202(a)(3), (c)(1), Nov. 2, 2002, 116 Stat. 1901, 1902.)

AMENDMENTS

2002—Pub. L. 107–273, § 13202(c)(1), made technical correction to directory language of Pub. L. 106–113, which enacted this section.

Subsec. (b). Pub. L. 107–273, § 13202(a)(3), redesignated par. (2) as (1), substituted "the Office shall send to the third-party requester a copy" for "the third-party requester shall receive a copy", redesignated par. (3) as (2), and struck out former par. (1) which read as follows: "This subsection shall apply to any inter partes reexamination proceeding in which the order for inter partes reexamination is based upon a request by a third-party requester."

## § 315. Appeal

(a) PATENT OWNER.—The patent owner involved in an inter partes reexamination proceeding under this chapter—

(1) may appeal under the provisions of section 134 and may appeal under the provisions of sections 141 through 144, with respect to any decision adverse to the patentability of any original or proposed amended or new claim of the patent; and

(2) may be a party to any appeal taken by a third-party requester under subsection (b).

(b) THIRD-PARTY REQUESTER.—A third-party requester—

(1) may appeal under the provisions of section 134, and may appeal under the provisions of sections 141 through 144, with respect to any final decision favorable to the patentability of any original or proposed amended or new claim of the patent; and

(2) may, subject to subsection (c), be a party to any appeal taken by the patent owner under the provisions of section 134 or sections 141 through 144.

(c) CIVIL ACTION.—A third-party requester whose request for an inter partes reexamination results in an order under section 313 is estopped from asserting at a later time, in any civil action arising in whole or in part under section 1338 of title 28, the invalidity of any claim finally determined to be valid and patentable on any ground which the third-party requester raised or could have raised during the inter partes reexamination proceedings. This subsection does not prevent the assertion of invalidity based on newly discovered prior art unavailable to the third-party requester and the Patent and Trademark Office at the time of the inter partes reexamination proceedings.

(Added Pub. L. 106–113, div. B, § 1000(a)(9) [title IV, § 4604(a)], Nov. 29, 1999, 113 Stat. 1536, 1501A–569; amended Pub. L. 107–273, div. C, title III, §§ 13106(a), 13202(a)(4), (c)(1), Nov. 2, 2002, 116 Stat. 1900–1902.)

AMENDMENTS

2002—Pub. L. 107–273, § 13202(c)(1), made technical correction to directory language of Pub. L. 106–113, which enacted this section.

Subsec. (b). Pub. L. 107–273, § 13106(a), reenacted heading without change and amended text generally. Prior to amendment, text read as follows: "A third-party requester may—

"(1) appeal under the provisions of section 134 with respect to any final decision favorable to the patentability of any original or proposed amended or new claim of the patent; or

"(2) be a party to any appeal taken by the patent owner under the provisions of section 134, subject to subsection (c)."

Subsec. (c). Pub. L. 107–273, § 13202(a)(4), struck out "United States Code," after "title 28,".

EFFECTIVE DATE OF 2002 AMENDMENT

Amendment by section 13106(a) of Pub. L. 107–273 applicable with respect to any reexamination proceeding commenced on or after Nov. 2, 2002, see section 13106(d) of Pub. L. 107–273, set out as a note under section 134 of this title.

ESTOPPEL EFFECT OF REEXAMINATION

Pub. L. 106–113, div. B, § 1000(a)(9) [title IV, subtitle F, § 4607], Nov. 29, 1999, 113 Stat. 1536, 1501A–571, provided that: "Any party who requests an inter partes reexamination under section 311 of title 35, United States Code, is estopped from challenging at a later time, in any civil action, any fact determined during the process of such reexamination, except with respect to a fact determination later proved to be erroneous based on information unavailable at the time of the inter partes reexamination decision. If this section is held to be unenforceable, the enforceability of the remainder of this subtitle [see Short Title of 1999 Amendment note set

out under section 1 of this title] or of this title [see Tables for classification] shall not be denied as a result.''

## §316. Certificate of patentability, unpatentability, and claim cancellation

(a) IN GENERAL.—In an inter partes reexamination proceeding under this chapter, when the time for appeal has expired or any appeal proceeding has terminated, the Director shall issue and publish a certificate canceling any claim of the patent finally determined to be unpatentable, confirming any claim of the patent determined to be patentable, and incorporating in the patent any proposed amended or new claim determined to be patentable.

(b) AMENDED OR NEW CLAIM.—Any proposed amended or new claim determined to be patentable and incorporated into a patent following an inter partes reexamination proceeding shall have the same effect as that specified in section 252 of this title for reissued patents on the right of any person who made, purchased, or used within the United States, or imported into the United States, anything patented by such proposed amended or new claim, or who made substantial preparation therefor, prior to issuance of a certificate under the provisions of subsection (a) of this section.

(Added Pub. L. 106–113, div. B, §1000(a)(9) [title IV, §4604(a)], Nov. 29, 1999, 113 Stat. 1536, 1501A–569; amended Pub. L. 107–273, div. C, title III, §13202(c)(1), Nov. 2, 2002, 116 Stat. 1902.)

AMENDMENTS

2002—Pub. L. 107–273 made technical correction to directory language of Pub. L. 106–113, which enacted this section.

## §317. Inter partes reexamination prohibited

(a) ORDER FOR REEXAMINATION.—Notwithstanding any provision of this chapter, once an order for inter partes reexamination of a patent has been issued under section 313, neither the third-party requester nor its privies,[1] may file a subsequent request for inter partes reexamination of the patent until an inter partes reexamination certificate is issued and published under section 316, unless authorized by the Director.

(b) FINAL DECISION.—Once a final decision has been entered against a party in a civil action arising in whole or in part under section 1338 of title 28,[1] that the party has not sustained its burden of proving the invalidity of any patent claim in suit or if a final decision in an inter partes reexamination proceeding instituted by a third-party requester is favorable to the patentability of any original or proposed amended or new claim of the patent, then neither that party nor its privies may thereafter request an inter partes reexamination of any such patent claim on the basis of issues which that party or its privies raised or could have raised in such civil action or inter partes reexamination proceeding, and an inter partes reexamination requested by that party or its privies on the basis of such issues may not thereafter be maintained by the Office, notwithstanding any other provision of

_____
[1] So in original. The comma probably should not appear.

this chapter. This subsection does not prevent the assertion of invalidity based on newly discovered prior art unavailable to the third-party requester and the Patent and Trademark Office at the time of the inter partes reexamination proceedings.

(Added Pub. L. 106–113, div. B, §1000(a)(9) [title IV, §4604(a)], Nov. 29, 1999, 113 Stat. 1536, 1501A–570; amended Pub. L. 107–273, div. C, title III, §13202(a)(5), (c)(1), Nov. 2, 2002, 116 Stat. 1901, 1902.)

AMENDMENTS

2002—Pub. L. 107–273, §13202(c)(1), made technical correction to directory language of Pub. L. 106–113, which enacted this section.

Subsec. (a). Pub. L. 107–273, §13202(a)(5)(A), substituted ''third-party requester nor its privies'' for ''patent owner nor the third-party requester, if any, nor privies of either''.

Subsec. (b). Pub. L. 107–273, §13202(a)(5)(B), struck out ''United States Code,'' after ''title 28,''.

## §318. Stay of litigation

Once an order for inter partes reexamination of a patent has been issued under section 313, the patent owner may obtain a stay of any pending litigation which involves an issue of patentability of any claims of the patent which are the subject of the inter partes reexamination order, unless the court before which such litigation is pending determines that a stay would not serve the interests of justice.

(Added Pub. L. 106–113, div. B, §1000(a)(9) [title IV, §4604(a)], Nov. 29, 1999, 113 Stat. 1536, 1501A–570; amended Pub. L. 107–273, div. C, title III, §13202(c)(1), Nov. 2, 2002, 116 Stat. 1902.)

AMENDMENTS

2002—Pub. L. 107–273 made technical correction to directory language of Pub. L. 106–113, which enacted this section.

## PART IV—PATENT COOPERATION TREATY

| Chap. | | Sec. |
|---|---|---|
| 35. | **Definitions** ............................................. | **351** |
| 36. | **International Stage** ............................. | **361** |
| 37. | **National Stage** ..................................... | **371** |

CODIFICATION

Analysis of chapters editorially supplied. Part IV added by Pub. L. 94–131 without adding analysis for chapters 35, 36, and 37.

Pub. L. 96–517 purported to amend the table of chapters of title 35 by adding after the item for chapter 37 the following: ''38. Patent Rights in Inventions Made with Federal Assistance''. Title 35 did not contain a table of chapters, and section 6(b) of Pub. L. 96–517 and the purported amendment made by it were repealed by Pub. L. 97–256. See chapter 18 (§200 et seq.) of this title.

## CHAPTER 35—DEFINITIONS

| Sec. | |
|---|---|
| 351. | Definitions. |

## §351. Definitions

When used in this part unless the context otherwise indicates—

(a) The term ''treaty'' means the Patent Cooperation Treaty done at Washington, on June 19, 1970.